682 F.2d 1055
 11 Fed. R. Evid. Serv. 359
 James SMITH, Appellee,
v.
The TOWN OF CLARKTON, NORTH CAROLINA; and J. Dwight Fort,
Individually and as Mayor of Clarkton; Dewitt Clark,
Individually and as Commissioner of Clarkton; Steve Prince,
Individually and as Commissioner of Clarkton; Linda Revels,
Individually and as Commissioner of Clarkton, Appellants,
National Committee Against Discrimination in Housing, Inc.,
Amicus Curiae,
NAACP Legal Defense and Educational Fund, Inc., and The
North Carolina Civil Liberties Union Legal
Foundation, Inc., Amicus Curiae.
 No. 81-1766.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 1, 1982.
Decided June 29, 1982.
 
 W. Osborne Lee, Jr., Lumberton, N. C. (Lee & Lee, Lumberton, N. C., on brief), for appellants.
 James J. Wall, Wilmington, N. C. (James B. Gillespie, Jr., Legal Services of the Lower Cape Fear, Wilmington, N. C., on brief), for appellee.
 Martin E. Sloane, Rachel M. Hopp, Washington, D. C., on brief, for amicus curiae The National Committee Against Discrimination in Housing, Inc.
 Jack Greenberg, James M. Nabrit, III, Lowell Johnston, Leslie J. Winter, New York City, on brief, for amicus curiae The NAACP Legal Defense and Educational Fund, Inc. and The North Carolina Civil Liberties Union Legal Foundation, Inc.
 Before PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Eastern District of North Carolina, which requires the town of Clarkton, North Carolina, to take affirmative steps to facilitate the construction of fifty units of public housing, originally planned in cooperation with the United States Department of Housing and Urban Development (HUD).
 
 
 2
 The action was filed by James Smith, a retired black man living in Bladen County, in which Clarkton lies, against Clarkton, its mayor-J. Dwight Fort, and three commissioners-Linda Revels, Dewitt Clark and Steve Prince, in their individual and official capacities. Clarkton, together with two similar, neighboring towns in Bladen County, had formed a joint housing authority which applied for and received preliminary approval and preliminary funding from HUD to construct fifty units of public housing in Clarkton. Fifteen acres of land was purchased and an architect was engaged, who made preliminary sketches for the project. The plaintiff's complaint alleged that the town officials, bowing to pressure from public sentiment in Clarkton, ordered the town's withdrawal from the multi-municipality housing authority, effectively blocking the construction of the fifty units of housing. The complaint further alleged that the public opposition to the housing was racially motivated and that the mayor and council, in pursuing official action terminating the project, were aware of the racial orientation of the opposition and acted as a result of it. The trial court, after a one-day bench trial, agreed, finding liability under the fourteenth amendment and section 3604 of the Fair Housing Act of 1968, 42 U.S.C. §§ 3601-3619, commonly known as Title VIII (the Fair Housing Act).[1] The trial court found no personal racial animus on the part of the defendants as individuals, and denied an award of general damages to Smith. It ordered affirmative remedial action, however, and the principal ground of the defendants' appeal contests the validity of that portion of the court's order requiring such action to assure the construction of public housing in Clarkton. We affirm for the most part the court's judgment and order, but modify that portion which orders Clarkton to itself construct the public housing if the other avenues of financing fail to materialize.
 
 I.
 
 3
 Initially, we dispose of the defendants' procedural argument that the trial court erred in allowing the complaint to be amended five weeks prior to trial to allege jurisdiction under the Fair Housing Act. The complaint was filed on July 30, 1980. In it, the plaintiff alleged jurisdiction under various statutory sections, including 28 U.S.C. §§ 1331, 1343 and 2201, and sought relief pursuant to 42 U.S.C. § 1981, 1982 and 1983. On April 27, 1981, the plaintiff by motion asked leave to amend his complaint to allege jurisdiction under the Fair Housing Act, 42 U.S.C. § 3612(a). There is no merit to the defendants' contention that the trial court erred in allowing this amendment or that the Fair Housing Act allegations were barred by that Act's 180-day statute of limitations. The Supreme Court in Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), emphasized that leave to amend under Fed.R.Civ.P. 15(a) "shall be freely given when justice so requires" and stated that "if the underlying facts or circumstances relied upon by plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits" and concluded that in the absence of any apparent improper motivation, such as undue delay, bad faith or dilatory tactics, the amendment should be "freely given." In Foman, the plaintiff had filed a complaint sounding in contract and subsequently attempted to amend under rule 15(a), asserting a right of recovery on a quantum meruit theory. The Court, in reversing the trial court's refusal to allow the amendment, stated that "the amendment would have done no more than state an alternative theory for recovery." Here, the original complaint alleged sufficient facts to state a claim for relief under either 42 U.S.C. § 1983 (the fourteenth amendment claim) or section 3612 of the Fair Housing Act. The addition by amendment of the specific allegation of jurisdiction under the Fair Housing Act sections merely states specifically an alternative theory of recovery, and we cannot say that the trial court abused its discretion in allowing that amendment. Since we hold that the amendment was properly allowed under rule 15(a), the "relation back" provision of Fed.R.Civ.P. 15(c) is effective to satisfy the 180-day time limitation contained in 42 U.S.C. § 3612(a).[2]
 
 II.
 
 4
 We next consider defendants' contentions that the trial court's factual determinations were clearly erroneous, that it improperly admitted certain testimony in violation of Fed.R.Evid. 802, that even if the trial court was correct in determining liability on their part for discriminatorily obstructing the construction of the public housing, it committed serious error in devising its remedy, and that the award of attorney fees was excessive.
 
 
 5
 The well-considered decision of the trial court, announced orally at the conclusion of the trial and reduced to written findings of fact and conclusions of law, was thorough in its treatment of the issues presented and the evidence adduced. The factual findings are fully supported by the record and inescapably lead to the conclusion that racially-discriminatory motives played a determinative part in the defendants' actions which blocked the construction of public housing in Clarkton. The pattern of racially-inspired decision making was not subtle, as such prejudice in the consideration of public housing often is, and as the trial court noted in its order, the reasons advanced by the town for withdrawing from the HUD project were "flimsy."
 
 A.
 
 6
 The demographic makeup of Clarkton and its environs paints a sharp picture of a community in which there exists a distinct pattern of racial separation. Clarkton proper is an unincorporated municipality of 664,[3] with whites making up 87.7% of the population. Clarkton in turn is part of Brown Marsh Township. The population of the latter is 62% white, but discounting the residents of Clarkton, its population is only 49% white.
 
 
 7
 Bladen County, in which Brown Marsh Township is located, has an agriculturally-dependent economy, is one of the poorest counties in North Carolina, and ranks in the bottom ten percent of the state in terms of per capita income. Within the county, 39.8% of all families live at less than 125% of the federally-defined poverty level, the eligibility threshold for low-income housing. Although blacks make up less than 40% of the total county population, 56% of all poverty-level families in the county are black, and 69.2% of all black families in Bladen County are presumptively eligible for low income housing, while only 26% of the white population is so qualified.
 
 
 8
 The effect of poverty on housing in the county is also well documented. Eighty percent of all housing is substandard, 60% of this is black-occupied, and the median price of housing in the county is approximately $5,000. The county-wide per capita income is $3,206, with that of blacks averaging $1,722. In contrast, the per capita income in Clarkton is $4,261. In spite of this, the trial court found that there was no evidence that Clarkton had any history of overt racial discrimination.
 
 
 9
 In 1968 the town commissioners of Clarkton established the Clarkton Housing Authority (CHA) in order to seek public housing funds for the town, but none had been secured by 1979. In February 1979, the Bladen County Planning Office held a public hearing attended by approximately 110 citizens of Bladen County, who, in a voice poll, enthusiastically supported public housing for the County. In May 1979, the Joint Municipal Housing Cooperative (JMHC) was formed by Clarkton and the nearby towns of Bladenboro and Elizabethtown to assist in acquiring and operating low-income public housing. As a joint governmental venture, the JMHC hired a director to coordinate its operations. Its governing body was composed of representatives of the participating municipalities, each of which contributed $2,000 to the JMHC. The JMHC determined that there was a need for 660 low-income housing units in Bladen County, and consulted with HUD, which determined that at least 150 units of public housing would be funded in Bladen County. That agency then set aside the necessary funds for these 150 units of public housing for use by the JMHC, with 50 units to be placed in each of the participating towns. The JMHC, working with the CHA, decided to place fifty units of public housing in Clarkton and applied to HUD for funding and project approval. The record indicates that the Clarkton officials were anxious to have the project expeditiously approved and built.[4] The Clarkton application was quickly approved by HUD, and the defendants agreed to provide water and sewer service for the project.[5] Further approval was obtained from the local area HUD office, the North Carolina Council of Governments, the United States Environmental Protection Agency, and the North Carolina Department of Natural Resources and Community Development. HUD appropriated $85,000 to the county which was used to purchase a fifteen-acre site for the housing units. The site was then deeded to JMHC. Invitations for survey proposals were sent to county surveyors and one survey proposal was about to be selected for contracting. Planning for the fifty units of low-rent public housing was further advanced by employing an architect, who substantially completed preliminary pre-construction sketches and site layouts.
 
 
 10
 The first public opposition to the housing project began to surface after the purchase of the fifteen-acre site within Clarkton. This opposition rapidly accelerated and in February, 1980, a petition signed by 176 Clarkton residents was presented to the commissioners requesting termination of action on the public housing project until the need for it had been studied and explained at a public hearing. On February 21, 1980, the commissioners responded by asking the JMHC to delay further action and directing Mike McGuinness, the JMHC's executive director, to solicit and collect applications for public housing from prospective tenants in order to establish the actual need for and interest in low-income housing. Applications were solicited by newspaper advertising and by sending a form letter to area residents in early March, 1980. In addition, one of Clarkton's commissioners, Clark, asked the County Community Action Office to solicit applications door-to-door. As a result of these solicitations, 101 black persons including James Smith, the appellee, and 48 white persons applied.[6] Of the first 119 applicants, 76 lived within Clarkton's mailing district and 17 lived within Clarkton's boundaries, while only 26 lived outside the immediate vicinity of Clarkton.
 
 
 11
 In the meantime, the racial animus of individual residents of Clarkton, who were opposing the public housing, was expressed in several specific instances. The defendant Prince, another of the town commissioners and the proprietor of a furniture store in Clarkton, stated in his testimony that as many as 50 persons came into his store on a single day solely for the purpose of voicing opposition to the public housing. One of them, in the presence of McGuinness and another person, stated that he did not want "coons either next door or in the town."
 
 
 12
 A public hearing was held on March 31, 1980, at which numerous objections to the project were raised. Initially, it was feared that the new housing would overburden the local schools, but that concern was removed when it was shown that most of the prospective tenants already lived in the schools' attendance zones. Objections based on rescue squad and police coverage were rebutted by statements from the Clarkton police chief that these vital services would not need to be upgraded. Finally, it was demonstrated that the housing project would not overburden sanitary services, such as sewers and trash collection.
 
 
 13
 Confident that public furor over the project had dissipated, the commissioners on April 14, 1980 directed the CHA to proceed with construction of the project. Not deterred by this, a group called the "Concerned Federal Income Taxpayers" appeared at the next council meeting and objected to the project because it was a "wasteful spending of federal money" and demanded that a poll be taken to gauge public sentiment. A poll of all registered voters of Clarkton was then taken, and resulted in 146 against "proposed public housing," 98 for, 4 no preference and 2 spoiled ballots. Consequently, the commissioners, at a May 12, 1980 meeting, "regretfully" asked for the resignation of the CHA members, and withdrew from the JMHC.
 
 
 14
 As a result of this action, a group of black residents of the "Booker T. Washington" area[7] of Brown Marsh Township sought federally-financed housing for their predominately black neighborhood. These efforts were rebuffed by HUD because the "all-white" town of Clarkton had no low-cost public housing, and funding of the "Booker T. Washington" project would serve to perpetuate the already existing pattern of racially-separated housing. In an effort to facilitate such in-town development, the group petitioned Clarkton officials for re-activation of the CHA. When these efforts fell on deaf ears, the group began working with the Bladen County Improvement Association (Association), a private non-profit organization, to develop 50 units of low-rent housing directly across the road from JMHC's fifteen-acre site. They sought a written commitment to provide sewer and water service from the commissioners at their March 9, 1981 meeting. Before acting on that request, the commissioners voted to consider a plan to build 20 units of elderly/handicapped housing on the original fifteen-acre site, and 30 units of general low-rent housing outside the town limits. They then voted to oppose the new 50 unit plan as duplicating their own "20/30" plan. When confronted with questions from Clarkton citizens on the "20/30" plan, the commissioners noted that if the 20 in-town units were built, they would be "sufficient" for the town's needs, thus precluding HUD financing of other projects, and noted that these units would be occupied only by the elderly, handicapped and disabled, and not "all types of people." Additionally, it was noted that such housing would be more "palatable" and would diffuse any civil rights suits.
 
 B.
 
 15
 In addition to the foregoing factual findings and the uncontroverted statistical data, the trial court additionally made the following findings:
 
 
 16
 a. That the plaintiff Smith applied for public housing on March 6, 1980, and that his application was approved by the JMHC and by HUD, and that he need not have taken any further steps to be admitted and that he would have been admitted to the public housing project subject only to verification of his income had not the appellants halted construction.
 
 
 17
 b. A total of 150 low-income persons applied for the housing and a majority of them were eligible for low-income housing.
 
 
 18
 c. That the plaintiff was and is ready, willing and able to pay the required rental and fees for public housing.
 
 
 19
 d. That after the property was purchased and the implementation of the program began, a number of Clarkton residents expressed their objections, which were motivated by a fear that black persons would reside in the project.
 
 
 20
 e. That the reasons advanced by the opponents at the public meetings and individually to the commissioners were that the project would: (1) increase the burden on public schools; (2) increase taxes; (3) overtax the capability of the local rescue squad; that there was insufficient police protection; inadequate water and sewer capacity; and finally, that the project would bring outside builders and laborers into Clarkton. None of these objections withstood close examination and the officials in charge of the various municipal services had previously testified that the additional housing would place no added burden on their ability to provide these various services. There being no evidence to support the objections advanced by the opponents of public housing in Clarkton, they "were flimsy and not supported by reason."
 
 
 21
 f. That the persons opposed to public housing were motivated in significant part by racial considerations, and for these reasons brought pressure on the defendants and because of the pressure, the defendants conducted a poll of persons living in Clarkton to determine the attitude concerning public housing and that the commissioners of Clarkton knew before the poll was conducted that a significant part of the opposition was racially motivated, and that virtually all of those voting in the poll were white.
 
 
 22
 g. That as a result of the poll, the commissioners adopted the resolution asking for the resignation of the members of the CHA and advising them to withdraw Clarkton's participation in the housing project.
 
 
 23
 h. That the motion was made with the knowledge and intent that it would halt the presently planned public housing in Clarkton, and that the effect of it was to halt the public housing in Clarkton.
 
 
 24
 i. That the commissioners voted to halt the public housing solely because a majority of persons voting in the poll opposed it and that there was no legitimate governmental reason causing any commissioner to stop the public housing project. The holding of a poll on the issue was a departure from the normal procedure used in the affairs of Clarkton and such a poll had never been conducted before.
 
 
 25
 j. That after halting the 50 unit public housing project, the defendants also opposed a subsequent effort by a non-profit group composed primarily of residents of a predominately black district of Bladen County to build fifty units of low income housing in Clarkton, knowing that this would discriminate against black persons and that the effect of these actions would impact most heavily on black persons and that they had acted in their official capacities in taking this action.
 
 
 26
 k. That removal of the low income housing in the County fell 2.65 times more harshly on black population than on the white.
 
 
 27
 l. That much of the land in Brown Marsh township outside the Clarkton town limits is not habitable due to high water and swamp conditions.
 
 
 28
 m. That there is no evidence that the defendants had a history of racially-discriminatory acts or actions and that the defendants as individuals acted in good faith, and that the defendants in their individual capacities were not racially motivated, and that the plaintiff had proved no actual damages.
 
 C.
 
 29
 The appellants contend that these factual findings of the trial court are clearly erroneous. Initially, they argue that the testimony of Bill Davis, the County Planner, and McGuinness concerning HUD's approval of the project and Smith's testimony concerning the approval of his application for housing should have been excluded as hearsay violating Rule 802 of the Federal Rules of Evidence and as being irrelevant and prejudicial under Rules 402 and 403. We disagree. The trial court did not err in admitting the testimony of McGuinness and Davis because it was demonstrated at trial that they were the officials in their respective agencies knowledgeable concerning the HUD application, HUD's procedures and the results of the application process. They had personal knowledge of whether the applications had been approved, and it was this knowledge, albeit received from HUD officials, that was the subject of their testimony. Smith's testimony was to an operative fact-that he was told his application was approved. Even if the admission of this testimony were error, it was harmless, Fed.R.Evid. 103, because both Davis and McGuinness, who were in a position to know, corroborated Smith's testimony that his application for a unit of the public housing had been approved.
 
 
 30
 The appellants correctly recognize that we cannot reverse the factual findings of the trial court unless they were clearly erroneous. Fed.R.Civ.P. 52(a). Additionally, in a discrimination case such as this one, we must be particularly hesitant to overturn the conclusions and findings of the district court as they relate to the design, motive and intent with which individuals act. Kennedy Park Homes Association v. City of Lackawanna, New York, 436 F.2d 108, 112 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). The court in Kennedy Park Homes said " '(o)nly by sifting facts and weighing circumstances' on a case by case basis can the 'non-obvious involvement of the state in private conduct be attributed its true significance.' " Id. at 112-13, citing Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this. The trial court, in making findings of fact, was faced with the same problems confronting trial courts everywhere sitting as finders of fact in cases involving racial discrimination. It is worthwhile to keep in perspective the single critical issue to be proved, and the brief trial in this case presented more direct evidence than is usually available for assessing the motives of those municipal officials effectively causing the cancellation of the public housing project in Clarkton.
 
 III.
 A.
 
 31
 The plaintiff alleges that his statutory rights guaranteed by section 804 of the Fair Housing Act, 42 U.S.C. § 3604, and his constitutional right to equal protection of the law have been violated. It is now settled, of course, that in order to recover under the fourteenth amendment's equal protection clause, a plaintiff must present proof of discriminatory intent on the part of the defendants. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). It is not so clear that as strict a standard is required in cases involving Fair Housing Act violations. Proof of discriminatory effect is, of course, sufficient to prove a violation of Title VII, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and some courts have reasoned that since the anti-discrimination objectives of Title VIII are parallel to the goals of Title VII, the Griggs rationale must be applied in Fair Housing Act cases. Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir. 1977), cert. denied, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (Arlington Heights II ).[8] See also Residents Advisory Board v. Rizzo, 564 F.2d 126 (3d Cir. 1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); United States v. City of Black Jack, 508 F.2d 1179 (8th Cir. 1974) (Black Jack II ). We agree with that analysis, and with the four critical factors utilized by the Seventh Circuit in Arlington II to determine whether a violation has occurred, namely, "(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of Washington v. Davis ; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." Id. at 1290.
 
 
 32
 An application of the first three factors to the events in Clarkton convincingly demonstrates the discriminatory effect of Clarkton's actions upon the plaintiff and other black residents of Bladen County. The undisputed statistical picture leaves no doubt that the black population of Bladen County was adversely affected by the termination of the housing project, as it is that population most in need of new construction to replace substandard housing, and it is the one with the highest percentage of presumptively eligible applicants. Secondly, the evidence adduced at trial discloses beyond peradventure that the actions of the defendants terminating the project resulted directly from the community's deeply-felt, intentional, invidious racial animus, and the defendants' alleged interests in pursuing the tainted action were almost wholly pretextual. Finally, the plaintiff, in his complaint, sought only to restore the status quo regarding the consideration of public housing in Clarkton, and did not seek injunctive relief which would require Clarkton to build public housing from its own treasury.[9] Applying this four-prong Arlington II analysis, or indeed any common sense analysis, the plaintiff has established a violation of the Fair Housing Act by proving that the defendants' actions had a discriminatory effect on the black citizens of Bladen County.
 
 B.
 
 33
 Additionally, there is ample evidence to sustain a finding of liability under the fourteenth amendment on the theory that the defendants acted with discriminatory intent. It is not necessary, in proving a violation of the equal protection clause, to show that the challenged actions rested solely on a racially-discriminatory intent in order to demonstrate that the involved officials acted with an intent to illegally discriminate. As the Supreme Court noted in Arlington Heights, "rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern or even that a particular purpose was the 'dominant' or 'primary' one." 429 U.S. at 252, 265, 266, 97 S.Ct. at 555, 563, 564, 50 L.Ed.2d 450. And in proving discriminatory intent under this test, racially disproportionate impact is a relevant factor for a court to consider. Id. The economically disadvantaged position of Clarkton and Bladen County is not disputed, nor is the statistical evidence of its effect on the plight of many of its citizens, both black and white, nor is the poor physical condition of available housing. While the abandonment of low-income public housing will have an effect touching upon all citizens of Bladen County, it is the black population that will suffer from the defendants' actions in a disproportionate manner.
 
 
 34
 There was strong testimonial evidence at trial reflecting the fact that racial discrimination was at work in the varied attempts to block the housing project. In addition to the direct evidence of racial bigotry, there was evidence of other statements by citizens, including the defendants, which in a different context might not illustrate racial bigotry, but, against the background of the housing project in Clarkton and the considerable opposition to it, were interpreted by the trial court as "camouflaged" racial expressions. There was testimony to the effect that Mayor Fort was concerned about an influx of "undesirables," and that residents at the March 31, 1980 public hearing opposed public housing since the new occupants would "dilute" the public schools, and that they were concerned about personal safety due to the influx of "new" people, "just as bad" who would move into the houses vacated by those persons moving into the new low-income housing.
 
 
 35
 As did the trial court, we view as significant the "opinion poll," conducted for the first time in the history of the small town of Clarkton immediately after expressions of racial opposition to the building of public housing units surfaced. Such deviations from the procedural norm by governmental decisionmakers in such circumstances are suspect when they lead to results impacting more harshly on one race than on another. Arlington Heights, 429 U.S. at 267, 97 S.Ct. at 564. Equally significant is the sequential withdrawal from participation in the project and the recommended discharge of the housing authority personnel admittedly based solely on the results of the poll.
 
 
 36
 There can be no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition. Commissioner Clark was aware that there would be "racial" questions at the public hearing, and characterized such opposition as "serious." Davis testified that there was "racial innuendo" and "racial pressure" being applied in an attempt to halt the project. Finally McGuinness testified that several leaders of the "citizen's committee" indicated to him that opposition to the project was primarily racial, and this was discussed with the commissioners.
 
 
 37
 Additionally, the actions of the town officials regarding subsequent public housing enterprises cannot be viewed separately from the bruhaha raised by the original plans. The denial of a black citizens' committee's efforts to secure fifty units of public housing across the street from the original fifteen-acre HUD site, when viewed against the backdrop of Clarkton's implausible explanation concerning the so-called "20/30" housing plan is highly probative of racially-based intent on the part of the town officials, and certainly casts doubt upon the credibility of their explanation for the original actions concerning the HUD-financed housing project. Added to this is the almost complete refutation of the "citizen's committee's" reasons for opposing the HUD-financed project.
 
 
 38
 The trial court's factual findings following the trial are not only not clearly erroneous, but are supported by the great weight of the evidence, and this evidence is more than sufficient to sustain the liability of the defendants under either the "discriminatory effect" test or one requiring the showing of discriminatory intent.
 
 IV.
 
 39
 In its remedial order, the trial court required Clarkton and its officials to stop hindering and blocking the building of the specific public housing units originally planned, and to take such steps as were necessary for the construction of 50 units of low-income housing. The order provided in pertinent part that:
 
 
 40
 1. Defendants shall rescind the action of the Town Board on May 12, 1980, asking for the resignation of the Town Board of Clarkton Housing Authority and withdrawing from the Board of the Joint Municipal Housing Cooperative.
 
 
 41
 2. Defendants shall rescind the action of the Town Board on March 9, 1981, approving plans submitted by the Joint Municipal Housing Cooperative to construct twenty units ...
 
 
 42
 3. Defendants shall maintain a full board of directors of the Clarkton Housing Authority.
 
 
 43
 4. Defendants shall take whatever action is necessary to construct or cause the construction of 50 units of public housing in the Town of Clarkton. The units shall be constructed in one or more of the following ways:
 
 
 44
 (a) Defendants shall rejoin the Towns of Elizabethtown and Bladenboro in the Joint Municipal Housing Cooperative and issue such letters as may be necessary for the Joint Municipal Housing Cooperative and the Department of Housing and Urban Development to carry out the project; or
 
 
 45
 (b) Defendants shall have the Town of Clarkton Housing Authority take all steps necessary for the construction of the 50 units; or
 
 
 46
 (c) Defendants themselves shall take all steps necessary for the construction of the 50 units.
 
 
 47
 The defendants shall use whichever of the above methods, or combination thereof, that will result in the most expeditious construction of 50 units of public housing in the Town of Clarkton....
 
 
 48
 5. Defendants shall not take any action which will interfere in any manner with (1) the planning and application for funds to construct the 50 units; (2) approval of said application for funds; (3) construction of said 50 units; or (4) application for the units by black persons or occupancy of the units by black tenants.
 
 
 49
 (Emphasis added).
 
 A.
 
 50
 The appellants strongly urge that the trial court exceeded its traditional equity powers in devising such a remedy for their violations of the Fair Housing Act and the fourteenth amendment because the appellants had neither statutory nor constitutional duties to affirmatively provide low income housing. The appellants are correct that in the abstract there is no constitutional or statutory right for individual citizens to have housing meeting a particular standard, nor is there a concomitant duty on the part of political entities to provide housing. Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). No municipality, however, may act in a manner which frustrates the Fair Housing Act's clear congressional mandate that it "is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Governmental bodies are bound to uphold and obey the provisions of the Fair Housing Act, United States v. City of Parma, Ohio, 661 F.2d 562 (6th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982), and cannot seek refuge in broad generalizations regarding the absence of a constitutional guarantee of adequate housing.
 
 
 51
 The equal protection clause of the fourteenth amendment, of course, prohibits invidious discrimination in the administration of any public program, including housing, administered by the states or their subdivisions unless there is a compelling reason justifying such distinctions. Arlington Heights, supra. Moreover, once a plaintiff has established the violation of a constitutional or statutory right in the civil rights area, a district court has broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs. As the Supreme Court stated in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970):
 
 
 52
 "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 321 U.S. 321, 329-330, (64 S.Ct. 587, 591-592, 88 L.Ed. 754) (1944), cited in Brown, II, (Brown v. Bd. of Ed.), supra, 349 U.S. (294) at 300 (75 S.Ct. 753, at 756, 99 L.Ed. 1083).
 
 
 53
 402 U.S. at 15, 91 S.Ct. at 1275. See United States v. City of Parma, Ohio, supra at 576.
 
 
 54
 In fashioning equitable relief for the violation of the Fair Housing Act, trial courts, of course, are guided by its underlying purposes. Metropolitan Housing Development Corp. v. Arlington Heights, 616 F.2d 1006, 1011 (7th Cir. 1980) (Arlington Heights III ); Parkview Heights v. City of Blackjack, 605 F.2d 1033, 1040 (8th Cir. 1979) (Black Jack III ), cert. denied, 445 U.S. 905, 100 S.Ct. 1081, 63 L.Ed.2d 321 (1980). One purpose of the Fair Housing Act is to encourage fair housing practices throughout the United States and to replace "the ghettos ... by truly integrated and balanced living patterns." United States v. City of Parma, Ohio, 504 F.Supp. 913 (N.D.Ohio 1980), aff'd in part, rev'd in part, 661 F.2d 562 (6th Cir. 1981), quoting Senator Walter Mondale, 114 Cong.Rec. 3422 (1968). It is axiomatic that a municipality cannot construct housing and then operate it in an illegally discriminatory manner, Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973), and it is just as clear that a municipality cannot discriminatorily interfere with a private organization's effort to construct low income housing. Arlington Heights, supra; Kennedy Park Homes v. City of Lackawanna, supra.
 
 
 55
 Reviewing the evidence in this case, it is impossible to escape the conclusion that racial discrimination of precisely the type condemned by both the Fair Housing Act and the fourteenth amendment's equal protection clause controlled Clarkton's consideration of low-income housing. Officials of the community, people of good will, initiated a project that would bring HUD-financed low income housing to an area which desperately needed it. Citizens of ill will, becoming aware that such housing would bring more black citizens from the outlying county area into Clarkton, aggressively mounted public opinion pressure against the municipal officials to block the housing, and those officials succumbed to that racially-inspired pressure.
 
 B.
 
 56
 The principal limitation on a court in devising remedies for violations of either the fourteenth amendment or the Fair Housing Act is that it should not intrude into the orderly functioning of local government any more than is necessary to remedy the specific ills brought on by the violation of a statutory or constitutional mandate or to fully achieve the goals of those provisions. See Black Jack III, supra at 1040; Resident Advisory Board v. Rizzo, supra at 149; Citizens Committee for Faraday Wood v. Lindsay, 507 F.2d 1065 (2d Cir. 1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975); Acevedo v. Nassau County, New York, 500 F.2d 1078 (2d Cir. 1974). We strongly believe that a municipality or other political entity cannot substantially construct public housing and then itself interfere with, block or impede its completion for reasons of racial discrimination. By the same token, not every statutory or constitutional violation in the fair housing field which interferes with the ultimate completion of a housing project which appears to be headed for fruition requires an affirmative remedy of the scope imposed in this case.
 
 
 57
 The trial court's order is broad and it requires affirmative action on the part of Clarkton and its officials. So far as it is confined to requiring the town and its officials to take each and every step ordered in paragraphs one, two, three, four(a), four(b), and five in order to place the project at the point of realization achieved prior to the appellants' violations, it is the type of order utilized time and again by other federal courts to heal the wounds caused by violations of a plaintiff's statutory and constitutional rights. United States v. City of Parma, Ohio, supra; Black Jack III, supra; Resident Advisory Board v. Rizzo, supra. As to these portions of its order, the district court thus acted well within its traditionally broad equitable power to fashion remedies for the violation of the plaintiff's civil rights. Swann, supra; see United States v. City of Parma, Ohio, supra; Resident Advisory Board v. Rizzo, supra. Requiring Clarkton to reinstitute the procedures and plans in place prior to the time of their termination due to the proven violations and requiring it to aggressively and in good faith pursue those plans is a remedy precisely tailored to the offense.
 
 
 58
 To require Clarkton to itself construct public housing units from its own locally-generated funds and then maintain them in perpetuity is another matter, and in the specific circumstances of this case, goes one step too far. That is not to say that such an order might not be proper in a different case, where for instance a project is abandoned for racial reasons after construction was substantially completed. At this point, however, this small, economically disadvantaged town has received $85,000 in HUD preliminary funding and has purchased the building site for the planned housing. Prior to being pressured into violating our nation's anti-discrimination laws by less responsible members of the community, the town officials, sworn to uphold the Constitution and laws of the United States, were acting in the best tradition of local government in seeking to better the condition of available housing in Clarkton, and we assume that all the defendants, including the town, will in good faith observe the court's order. Should this assumption prove too generous and it subsequently appears that the defendants are procrastinating or otherwise attempting to circumvent the requirements of the district court's order, that court can still act, since it has retained jurisdiction of the matter. Such interference with or disregard of its remedial order, or the order of this court, might be the final straw that would justify more wide-ranging judicial intrusion into Clarkton's local affairs, even to the extent of requiring it to build this planned housing from its own resources. To require Clarkton to completely build the project at this time from its own resources would, however, under the circumstances presented by the record in this case, exceed the traditional scope of an equity court's remedial arsenal and would be an unwarranted intrusion into Clarkton's local governmental function, disproportionate to the wrong committed. Therefore, we modify the order of the district court by deleting subparagraph four(c) and construing the balance of the order as requiring the defendants to take each and every step, short of directly funding actual construction, necessary to facilitate the development of low-rent housing in Clarkton. This, of course, does not excuse them from incurring those municipal expenses normally arising from the construction of housing by a developer, public or private, within the town, or expenses related to full compliance with the balance of the district court's remedial order. We affirm its decision in all other respects.
 
 V.
 
 59
 The district court awarded the plaintiff $10,000 in attorney's fees and $1,228.10 in costs. The trial court properly applied the standards enunciated in Anderson v. Morris, 658 F.2d 246 (4th Cir. 1981), and Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978), and that portion of the judgment is also affirmed.
 
 
 60
 The judgment of the district court is therefore modified, 28 U.S.C. § 2106, in conformity with the views expressed in this opinion, and as modified, is affirmed in all respects. We remand the case to the district court, however, to allow the plaintiff/appellee to apply to that court for the award of attorneys' fees and costs in connection with this appeal. McManama v. Lukhard, 616 F.2d 727, 730 (4th Cir. 1980).
 
 
 61
 AFFIRMED AS MODIFIED AND REMANDED.
 
 
 
 [1]
 42 U.S.C. § 3604 provides:
 As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful-
 (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.
 (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.
 (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.
 (d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.
 (e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.
 The district court dismissed claims based on 42 U.S.C. §§ 1981 and 1982. The plaintiff did not appeal this dismissal, and we do not address it.
 
 
 [2]
 42 U.S.C. § 3612(a) provides:
 (a) The rights granted by sections 3603, 3604, 3605, and 3606 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: Provided, however, That the court shall continue such civil case brought pursuant to this section or section 3610(d) of this title from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: And provided, however, That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected.
 See generally 6 C. Wright & A. Miller, Federal Practice and Procedure § 1497 (1971 & 1982 Supp.).
 
 
 [3]
 Population and census data from the 1980 census was utilized at trial, supplemented by data from the Census Bureau's 1977 Per Capita Money Income Estimates
 
 
 [4]
 This is borne out by their participation in the JMHC, funding of its programs, and their aggressive cooperation with state and federal officials in securing necessary funding and approval
 
 
 [5]
 A bone of contention at trial involved the use of the word "approved" in connection with HUD action on Clarkton's request. Whatever the nuances of HUD's internal operating rules and definitions of final approval, there can be no doubt that the federal government had given the project its blessing to the tune of $85,000 appropriated for site acquisition, had granted at least preliminary approval through its area office and was working with JMHC to finalize a comprehensive housing plan for Bladen County
 
 
 [6]
 The application form used did not require an applicant to disclose his or her race. This information was independently tabulated by McGuinness
 
 
 [7]
 This area derives its name from that of the segregated, all-black school formerly located in the area
 
 
 [8]
 In its Arlington Heights decision, the Supreme Court dealt only with the issue of whether the exclusionary zoning practices there alleged violated the fourteenth amendment. On remand, the Seventh Circuit examined the extent to which the plaintiffs' allegations made out a violation of the Fair Housing Act
 
 
 [9]
 The trial court's order did mandate that the defendants affirmatively provide low-income housing for Bladen County, but our modification of that order limits this to an affirmative requirement to not enter into other housing projects in an effort to limit the movement of blacks into Clarkton, to avoid any and all interference in the orderly process of securing appropriate funding, and to reinstate those local housing authorities in place at the time of the violations-all aimed at placing the parties in the positions they occupied before the violations occurred. See part IV(B) of this opinion, infra