318

Ernestine ATKINS; Ella L. Spruill; Doretha B. Stokes; Shernita Washington; Simon R. Miller; Maurice Steingold, in their own behalf and on behalf of all others similarly situated, Appellants,

v.

William A. ROBINSON, individually and as Tie-Breaker for Board of Supervisors, Greensville Co., Va.; John W. Woodruff, Jr.; Peggy A. Wiley; Garland P. Faison; Charles A. Sabo, All Individually and as members of Bd. of Supervisors of Greensville Co., Va.; County of Greensville, Va.; Virginia Housing Development Authority; United States Department of Housing and Urban Development, Appellees.

Ernestine ATKINS; Ella L. Spruill; Doretha B. Stokes; Shernita Washington; Simon R. Miller; Maurice Steingold, in their own behalf and on behalf of all others similarly situated, Appellants,

v.

William A. ROBINSON, individually and as Tie-Breaker for Board of Supervisors, Greensville Co., Va.; John W. Woodruff, Jr.; Peggy A. Wiley; Garland P. Faison; Charles A. Sabo, All Individually and as members of Bd. of Supervisors of Greensville Co., Va.; County of Greensville, Va.; Virginia Housing Development Authority; United States Department of Housing and Urban Development, Appellees.

Nos. 82–2090, 83–1198.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 7, 1983.

Decided April 30, 1984.

Rehearing Denied June 26, 1984.

Stephen W. Bricker, Richmond, Va. (Bremner, Baber & Janus, Richmond, Va., Bruce S. Gelber, Janet LaBella, Washington, D.C., National Committee Against Discrimination in Housing, Inc. on brief), for appellants.

Richard K. Bennett, Richmond, Va. (P. Christopher Guedri, Browder, Russell, Morris & Butcher, Richmond, Va., on brief), Robert W. Jaspen, Asst. U.S. Atty., Carl F. Bowmer, Richmond, Va. (Christian, Barton, Epps, Brent & Chappell, Russell O. Slayton, Jr., Hammack, Slayton & Bain, William A. Robinson, John W. Woodruff, Jr., Peggy A. Wiley, Garland P. Faison, Charles A. Sabo on brief), for appellees.

Before PHILLIPS and ERVIN, Circuit Judges, BUTZNER, Senior Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

In this case, plaintiffs, a class of low-income black residents of Greensville County, Virginia (County),[1] appeal from the district court's ultimate disposition of their claims under Title VIII of the Civil Rights Act of 1964 and under 42 U.S.C. §§ 1981, 1982 and 1983. Specifically, they challenge the district court's failure to award damages and other requested forms of injunctive relief against the County defendants,[2] and its failure to find liability on the part of defendants Virginia Housing Development Authority (VHDA) and the United States Department of Housing and Urban Development (HUD).[3] We affirm.

I

The essential facts, more exhaustively set forth in the district court's opinion,[4] are as follows. Greensville County in southside Virginia is not a wealthy county. Partially as a result of the County's history of official discrimination in housing, the County's black residents occupy roughly two-thirds of the County's substandard housing units and to this day living patterns remain segregated along racial lines.

In an attempt to assuage these conditions, S & M, a developer of low-income housing, contracted in early 1981 to purchase land in Greensville County on which to build a state- and federally-subsidized housing project to be called Emporia Heights. S & M thereafter applied to VHDA for a mortgage construction loan, envisioning that Emporia Heights residents would receive rental assistance payments from HUD under section 8 of the United States Housing Act of 1937 (Section 8).[5]

VHDA is a political subdivision of the Commonwealth of Virginia statutorily empowered to provide permanent construction

---

1. Also plaintiffs are Simon R. Miller and Maurice Steingold, real estate developers doing business under the name S & M.

2. The County defendants include Greensville County itself, the members of the Greensville County Board of Supervisors (Board) in their individual and official capacities, and William A. Robinson, the Board's tie-breaker, in his individual and official capacity.

3. Initially, VHDA and HUD were joined as defendants under Fed.R.Civ.P. 19(a) as parties necessary to the affording of complete relief. Later in the proceedings, however, the plaintiffs filed a Notice of Motion which raised the question of the agencies' liability. Although the complaint itself was never formally amended, the district court addressed the liability question on the merits in its opinion and held that neither agency was liable. Nevertheless, the court imposed upon both agencies certain duties enforceable by contempt sanctions under its final decree. Despite the questionable propriety of imposing such duties upon a party who has not been found liable, we will not disturb this aspect of the decree, as neither VHDA nor HUD has cross-appealed.

4. *Atkins v. Robinson,* 545 F.Supp. 852 (E.D.Va. 1982).

5. Section 8 subsidies provide only rental assistance and are used in large part to defray the interest expense on the project's construction loan; thus, the developer must obtain financing for the actual *construction* of the project from other sources, such as VHDA.

financing for projects such as Emporia Heights. It is also empowered to receive Section 8 rental assistance subsidies from HUD on behalf of the residents of HUD-approved projects and to funnel these subsidies directly to the projects' owners. VHDA receives from HUD central in Washington, D.C., a yearly "set aside" of Section 8 New funds [6] available for financing new projects in the form of "contract authority." Typically, VHDA is notified informally of its set aside for the upcoming year in November or December, and is notified formally in January, after which VHDA advertises for project proposals to use the set aside. VHDA then reviews the currently submitted proposals along with those in its "pipeline," i.e., proposals submitted, but not funded, in prior years.

After initial review of the available projects for compliance with certain statutory criteria, VHDA "approves for further processing" certain projects for consideration by its mortgage loan committee. Concurrently it submits these projects to HUD as requests for "reservations" of its Section 8 New set aside. HUD then performs an independent technical compliance review.[7] This review, however, involves no appraisal of the projects' merits apart from their compliance with HUD regulations; the choice of which complying projects will receive funds belongs exclusively to VHDA.

Although VHDA is vested with considerable discretion in choosing the projects it will fund, Virginia law bars it from financing a proposed multi-family project unless it finds "that the governing body of the locality has not, within sixty days after written notification of the proposed financing has been sent the governing body by [VHDA], certified to [VHDA] in writing its

disapproval" of the project. Va.Code § 36–55.39. Typically, VHDA sends a "60-day letter" to the local governing body advising it of its "veto power" at the same time that it submits to HUD the proposals which have been "approved for further processing." If VHDA initially decides not to fund a particular project, it is placed in the VHDA's "pipeline" where it is eligible for reconsideration if funds are "recaptured" because of the failure of an already-approved project, or for reconsideration in a later year. If, however, the locality vetoes a project, it is permanently excluded from the VHDA "pipeline" and is thus ineligible for further VHDA consideration.

Even if the project is vetoed, however, the project may be funded through HUD Central's Discretionary Fund without the aid or inhibition of VHDA. This fund, consisting of 20% of HUD's total annual housing assistance appropriation, may be used for a variety of purposes, including allocations to state agencies like VHDA to fund specific projects requested earlier. The criteria for obtaining access to the fund, however, are ambiguous. The evidence adduced at trial indicates that its disbursement depends in part upon political "string-pulling."

On January 15, 1981, VHDA was notified that its set aside for fiscal year 1981–82 was approximately $4.2 million. In response to VHDA's advertisements for proposals, S & M submitted the Emporia Heights application in February 1981. In March 1981, HUD notified VHDA that federal budgetary reductions made it likely that VHDA would receive only 50% of its original set aside, i.e., $2.1 million. Nevertheless, on April 21, 1981, VHDA "approved for further processing" eleven

---

**6.** The Section 8 New program provides rental assistance for residents of newly-constructed HUD-approved projects. Also available are funds for low-income residents of already-existing units under the Section 8 Existing and Moderate Rehabilitation program.

**7.** One of HUD's primary functions in this review is to ascertain whether the proposed projects comply with the housing needs of the localities

for which the projects are projects. Data for this determination are gleaned from the locality's Housing Assistance Plan (HAP) which detail housing statistics and specify the means whereby housing assistance goals are sought to be met. Greensville County submitted such a HAP in connection with its 1980 application for a Community Development Block Grant (CDBG).

projects whose total required funding exceeded the 50% level.

On April 21, 1981, VHDA sent the list of eleven projects to HUD for review and approval, but listed seven as being of top priority, because, as the district court found, the developers of these projects could affirmatively demonstrate local governmental support, which VHDA used as a barometer of the project's likelihood of eventual success. As was VHDA's practice, Emporia Heights was placed in the non-priority group because of the absence of any evidence of local support.[8] The district court found, however, that at the time of this initial setting of priorities VHDA was not aware of any opposition to the Emporia Heights project in Greensville County. While VHDA subsequently learned, in a meeting with a HUD representative on June 4, 1981, that its set aside reduction was only 40%, rather than 50%, of its original allocation, the seven top-priority projects were eventually funded and ultimately consumed all of VHDA's 1981 contract authority.

Also on April 21, 1981, VHDA sent a "60-day letter" to the Greensville County Board of Supervisors. The Board met on May 19, 1981, and voted 2–2 on a motion to disapprove the project and to pursue instead a Section 8 Existing and Moderate Rehabilitation program in the County.[9] An independent motion to pursue the Section 8 Existing and Moderate Rehabilitation program passed unanimously. The tie-breaker appointed by and for the Board met with the Board on June 1, 1981, but stated that he had insufficient information on which to base his vote at that time. At a meeting on June 17, however, the tie-breaker voted to

disapprove the project, and the next day the Board notified HUD's Richmond office of its decision.

The veto of Emporia Heights was not the Board's first action to inhibit a proposed low-income housing project. In 1971, before the enactment of the "veto" statute, the Board blocked construction of two federally-subsidized housing projects and voted to "go on record as opposing this type of housing." In March 1981, just before VHDA accepted the Emporia Heights project for further processing, the Board voted to disapprove the Landura project. The Landura project was not a VHDA project; however, its funding was to come from HUD directly. While the court was unable to find that these three instances of opposition to public housing constituted a "series of official actions taken for invidious purposes," it did find that the policy rested upon a "deep-seated opposition to rental assistance programs, and that at least some racial overtones cloud[ed] the County's experience with low-income housing proposals."[10]

The district court found, and on appeal the defendants concede, that the Board's veto of the Emporia Heights project had the effect, at least in part as intended, of discriminating against the plaintiff class in housing because of race in violation of Title VIII of the Civil Rights Act of 1964 and of 42 U.S.C. §§ 1981, 1982, and 1983. *See Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir.1982); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). The court, however,

---

**8.** Although the record is somewhat nebulous on this point, the available evidence supports the district court's finding that the seven top-priority projects were assigned their priority on the basis of affirmative evidence of local support. The bottom four were placed there because of the lack of any such affirmative evidence, rather than because of the presence of any known local opposition.

**9.** A representative of VHDA was present at this meeting to explain the various HUD options available to the County.

**10.** In recent years, however, the Board appeared to have taken some steps toward providing housing assistance to low-income residents. The County's 1979 Comprehensive Plan, its 1980 Community Development Block Grant application, and its HAP demonstrate a desire to promote housing assistance and, in particular, to encourage construction of subsidized multifamily housing projects.

declined to find that VHDA or HUD had violated any principle of federal law, thus rejecting the theory that the agencies had an "affirmative duty to override a locality's opposition to a proposed housing project and force it to accept" the project. 545 F.Supp. at 888.

More importantly for purposes of this appeal, however, the district court refused to assess damages against the County defendants in the amount of the funds that theoretically might have been granted for construction had the veto not been made. The court found as a matter of fact that VHDA's decision to place Emporia Heights on the non-priority list at the time it submitted its request for reservations against its set aside to HUD in April of 1981 was based not upon any knowledge of the Board's opposition to the project, but upon the complete absence of any evidence whatever of local governmental support. Since the seven projects that were placed on the priority list eventually consumed all of the alloted set aside for the fiscal year, the court found that Emporia Heights's failure to be funded was caused not by the veto but by the cutback in available federal funds. The effect of the veto was prospective only, *i.e.*, to remove Emporia Heights from the VHDA pipeline, thus rendering it ineligible for future VHDA set aside recaptured later in the year or for VHDA financing in the event that the developers should be successful in obtaining subsidization from the HUD Discretionary Fund. Although this effect was not imaginary, the court held that the likelihood of either source of funding's coming into fruition was too speculative to merit a damage award.

The court also declined to grant certain forms of injunctive relief against all of the defendants. Most notably, the court refused to grant "site-specific relief" in the form of an order that VHDA, HUD or the County make available the necessary funding of the project. Similarly, it refused to order the County defendants to adopt a housing assistance plan, to establish a fair housing education program for all County officials, and to refrain from discriminating against persons in housing on the basis of race, color, sex or national origin. The court's decree was limited to declaring the veto void, restraining the County defendants from taking any action to interfere with VHDA and HUD consideration of the project, and to direct VHDA and HUD to restore the project to the VHDA pipeline for consideration as if the veto had never occurred.

## II

The plaintiffs' primary contention on appeal is this: crucial factual findings made by the district court are either inconsistent with the relief ultimately given, or are clearly erroneous in light of the evidence given at trial. The plaintiffs seek to have us remand the case to the district court for a redetermination of the facts so as to resolve these inconsistencies and, in light of the redetermined facts, to exercise its equitable discretion anew in fashioning relief appropriate to those facts. These facts, they urge, if found in accordance with the record, will show that VHDA and HUD are liable for violations of the federal statutes under which the plaintiffs sue and that the plaintiffs are thus entitled to a decree significantly more effectual than the decree here on review.[11]

---

**11.** Along with their primarily factual contentions, the plaintiffs argue that, for purposes of determining whether damages properly should have been awarded, the district court erroneously imposed upon them the burden of showing that Emporia Heights would have been funded had the Board not registered a veto. Analogizing to the Title VII context, they reason that once the defendants have been found to violate Title VIII, they should bear the burden of showing that Emporia Heights would *not* have been funded *despite* the absence of a veto. We have

considered this argument, but are persuaded that the district court correctly required the plaintiffs to prove up any damages to which they were allegedly entitled. The appellants' allegations involved several defendants. The record reveals that for the purpose of establishing liability the lower court carefully distinguished between the County Board and VHDA. There is no reason why a finding of liability on the part of the County Board should relieve the plaintiffs of their burden of coming forward

Specifically, the plaintiffs argue that the district court in effect found that the Board's eleven-year policy of opposing low-income housing constituted a "pattern or practice" of discrimination which led to the inability of the Emporia Heights developers to demonstrate local support, and hence to be included on the list of seven "super-priority" projects. This finding, they contend, is logically inconsistent with the court's finding that cutbacks in available section 8 funds were the cause of Emporia Heights's demise and with the court's corresponding ultimate failure to award damages. Also, the plaintiffs argue that the district court clearly erred in its findings regarding the chronology of events occurring in March through June 1981. The evidence, they say, compels a finding that VHDA had knowledge of the Board's opposition to the project as early as May 17, 1981, and that when VHDA and HUD met on June 4, 1981, to make final funding decisions, both agencies acquiesced in the Board's racially-motivated disapproval. According to plaintiffs, this acquiescence gives rise to Title VIII liability on the part of both agencies.

We understand the appellants' concern. Although the lower court was unable to conclude that the County had taken a "series of official actions ... for invidious purposes," the court cited a series of County decisions opposing proposed low income projects that, in its view, were "clouded" with "racial overtones" and marked by "camouflaged" racial expressions. When these latter findings are coupled with the court's conclusion that the County Board's veto decision of June 16 "rested at least in part on a racially discriminatory intent," and that the decision had a "racially discriminatory impact," it is somewhat difficult to understand how the court reached the conclusion that the plaintiffs had failed to establish that the County had engaged in a pattern or practice of racial discrimina-

tion. *Cf. EEOC v. Ford Motor Co.,* 645 F.2d 183, 197 (4th Cir.1981) (a single contested employment decision sufficient to find a pattern or practice of discrimination in Title VII context).

Our concern over this particular legal conclusion, however, is immaterial to the outcome of this appeal. For as the lower court pointed out, even if the County Board's 1971 policy committed it to a pattern or practice of discriminatory activity, the plaintiffs failed to demonstrate that VHDA was aware at the time the ranking decision was made that the County's track record was racially motivated, or that the VHDA deprioritized Emporia because of the County's history of racially based opposition. The court specifically found that the plaintiffs had presented insufficient evidence on this point, and we have no basis to conclude that this finding was clearly erroneous. Similarly, we cannot find clearly erroneous the district court's findings regarding VHDA's lack of knowledge of the Board's racially based opposition to the Emporia Project at the time it learned of its final cutbacks on June 4, 1982, and its ultimate holding that the plaintiffs are not entitled to damages.[12] Thus we agree with the district court's holding that neither VHDA nor HUD is liable for any alleged "acquiescence" on their parts. The district court correctly resolved these issues and we therefore affirm on its reasoning. *Atkins v. Robinson,* 545 F.Supp. 852 (E.D.Va. 1982).

AFFIRMED.

with evidence to establish a prima facie case against VHDA.

**12.** The district court correctly denied other requested forms of injunctive relief on the grounds that they would interfere unduly with local governmental affairs. Despite the court's

finding that the veto was racially motivated, it was not improper for the court to allow the defendants an opportunity in good faith to conform to the law, while opening the door for plaintiffs to petition the court for further relief should compliance not be forthcoming.