Angelique JACKSON and Ethel Musgrove, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

OKALOOSA COUNTY, FLORIDA; Don Ware, Bill Peebles, Mike Mitchell, Kathie O'Dell, Ferrin Campbell, Jr., in their official capacity as the Board of Commissioners for Okaloosa County; James Robbins, Sr., Patrick Carpenter, Ruby Youngblood, Claudia Brown King, Pat Thornber, James Hughes, Lee Terrell, in their official capacity as the Fort Walton Beach Housing Authority; James Brewer, in his official capacity as the Executive Director of the Ft. Walton

**1532**

Beach Housing Authority; United States Department of Housing and Urban Development; Jack Kemp, as Secretary of the U.S. Department of Housing and Urban Development, Defendants–Appellees.

No. 92–2991.

United States Court of Appeals,
Eleventh Circuit.

June 8, 1994.

Kristine Knab, Jack L. McLean, Edward J. Grunewald, and Ann Pickett Perko, Legal Services of North Florida, Inc., Tallahassee, FL, for plaintiffs-appellants.

Patricia Guilday, Pensacola, FL, Gregory T. Stewart, Thomas H. Duffy, and D. Lloyd Monroe, IV, Tallahassee, FL, for defendants-appellees.

Before ANDERSON and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.

ANDERSON, Circuit Judge:

Appellants Jackson and Musgrove appeal the dismissal of their class action complaint against Okaloosa County, Florida and its Commissioners, (the "County"), and the Fort Walton Beach Housing Authority and its members, (the "Authority"), regarding the siting process for a new public housing project. All defendants were sued under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and the County was also sued under 42 U.S.C. §§ 1982 and 1983. Both defendants made motions to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) that were granted. For the following reasons we reverse the decision of the district court and remand for further proceedings.

■ At the outset we note that in reviewing motions to dismiss we accept as true the facts stated in the complaint and all reasonable inferences therefrom. *Stephens v. Dept. of Health and Human Services,* 901 F.2d 1571, 1573 (11th Cir.1990). Moreover, we may only affirm the dismissal of the complaint if it is clear that "no relief could be granted under *any* set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (emphasis added).

## I. FACTS AND PROCEEDINGS BELOW

■ For the purposes of this appeal we accept the facts that follow as true. Plaintiff Jackson is an African–American woman who receives public benefits, lives in a racially impacted[1] area of Fort Walton Beach, Florida, is eligible for public housing, and whose name is on the Authority's wait-list for public housing. She expects to move into a new project that will be built by the Authority, and she wants this facility to be located in an area without a concentrated minority population. Plaintiff Musgrove presently resides in public housing provided by the Authority, in the facility located at Third Street and Methodist Avenue. The census tract containing this unit is 38% African–American, the highest proportion within the territorial limit of the Authority. Because she does not want her racially impacted neighborhood to become further segregated, Musgrove does not want the new housing project to be constructed in her neighborhood. These two plaintiffs filed a class action against the defendants on behalf of themselves and all others similarly situated. The class has not yet been certified under Fed.R.Civ.P. § 23(c).

The Authority was established under Fla. Stat. § 421.04 to provide public low-income housing and housing assistance. It operates all public housing in the Fort Walton Beach area, which is a city with a population under 25,000. Current public housing facilities, which contain a total of 186 units, are located at Third Street and Methodist Avenue, and on Ed Brown Street. Under Florida law, the territorial area of operation of housing authorities in cities having a population of less than 25,000 includes the area within 5 miles of the territorial boundaries of that city. Fla.Stat. § 421.03(6)(a). The area within five miles of Fort Walton Beach, Florida, includes areas that are unincorporated and lie within the boundaries of Okaloosa County. Hereafter in this opinion, we will refer to two geographic areas: (1) the racially impacted census tract, an area that lies wholly within the boundaries of the town of Fort Walton Beach, is 38% African–American, and in which is located all existing public housing; and (2) the unincorporated five-mile area, lying within both the territorial jurisdiction of the Authority and the County, which has a population that is 8% African–American and 88% white.

The plaintiffs allege that the defendants have maintained racially segregated public housing in the Fort Walton Beach area. Although the Okaloosa County population is 8% African–American, all of the public housing units built within the Authority's territory have been built in one predominantly Afri-

---

**1.** The record before us does not define "racially impacted", but case law has defined the term to mean that the percentage of persons of a particular race living in a racially impacted area exceeds twice the percentage living in the county.

*See Jaimes v. Toledo Metropolitan Housing Authority,* 758 F.2d 1086, 1090, n. 6 (6th Cir.1985). Okaloosa County is 8% African–American, thus an African–American impacted area would be at least 16% African–American.

can–American neighborhood, within the city limits of Fort Walton Beach; and this neighborhood lies within the racially impacted census tract. Ninety-two percent of the residents in the Authority's existing housing are African–American, and eighty-six percent of the persons on the Authority's waiting list are African–American.

In July 1988, the Authority applied to HUD for $2,500,000 to construct 50 units of multi-family housing. In its application, the Authority identified a site on Bass Street that is adjacent to existing public housing as the proposed construction site, although there were several sites within the Authority's territorial limit that met HUD's selection criteria and were not in areas impacted by race.[2] This proposed site also was located in the racially impacted census tract. HUD approved the Authority's application for the construction funds in September 1988.

HUD rules require a housing authority to obtain a cooperation agreement with pertinent local governments to build housing. Therefore, the Authority sought permission to build public housing in the unincorporated five-mile area from the Okaloosa County Board of County Commissioners. HUD procedure requires a housing authority to identify a potential site within the local government's jurisdiction when the authority seeks a cooperation agreement with that government. Thus, the Authority identified for discussion purposes a potential construction site within the unincorporated five-mile area when it approached the County. Several white residents living near this potential site expressed objections to the Authority's request. The County initially rejected the Authority's request. Later, the County agreed, in theory, to cooperate with the Authority. However, the County unilaterally enacted a policy (the "Policy") pursuant to which the County would permit the construction of public housing. The County tendered the Policy

to the Authority in a unilaterally designated "Cooperative Agreement."

The Policy adopts several requirements for the approval of a site for public housing. No project can be sited in the unincorporated five-mile area unless approved by a majority vote of the Board of County Commissioners. Actual notice of the scheduled vote must be given to property owners in the affected area of the project. If the vote of the Board fails, project sponsors can only obtain approval by majority vote in a referendum of the residents in the voting precinct where the project would be located. The Policy also requires the Authority to pay the cost of notice to property owners of upcoming votes and referendums.

In January 1992, the Authority solicited bids for proposed sites for the construction of its 50 unit project. Although the Authority had proposed the Bass Street site, the bidding was open to other sites. However, the bidding procedure required that any site in the unincorporated five-mile area have site-specific approval of the County, thus in effect incorporating the requirement's of the County's Policy. One bidder submitted a site zoned for multi-family housing in the unincorporated five-mile area.[3] That bidder sought site-specific approval of this site from the County, but requested that the site be approved without the procedural requirements of the Policy. The County informed the bidder that it would maintain adherence to the Policy, and the bidder did not complete the process for approval mandated by the Policy.

On February 26, 1992, the Authority ranked the bids for the project, but it did not consider the bid submitted in the unincorporated five-mile area, because that bidder had not obtained site-specific approval. The bid submitted for the unincorporated five-mile area was the only bid submitted that would have allowed the new facility to be sited in an area that was not racially impacted. The

2. The record does not make clear how or why the Authority decided to name this site, or the relevance of this site to the bidding process described below.

3. The specific address of this site is not stated in the record. However, it is clear that a specific

site was submitted. Nor does the record reveal the relationship of this site, if any, to the site in the unincorporated five-mile area originally suggested by the Authority for discussion with the County regarding the cooperation agreement.

Authority ranked first a bid site submitted by Barber Construction, Inc. This site, located at Third Street and Shell Avenue, is located within the racially impacted census tract and is immediately adjacent to existing public housing, where 92% of the residents are African–American, including plaintiff Musgrove. HUD had not given final approval to the site at the time the plaintiffs filed their complaint.

On May 22, 1992, the appellants filed their complaint in the district court. The complaint claimed that the Authority had violated the Fair Housing Act by incorporating the Policy in the bidding process and maintaining a pattern of segregated residential public housing within the territorial limit of the Authority. The appellants made the same segregation claim against the County and alleged that by enacting the Policy the County had violated the Fair Housing Act, through intent and effect, by excluding African–American tenants of public housing from the unincorporated five-mile area. The complaint also alleged that the County, by enacting its Policy, had violated 42 U.S.C. §§ 1982–83. The appellants sought, *inter alia*, the following relief: a declaratory judgment and an injunction requiring the County to strike the Policy and requiring the Authority to strike the portions of the bidding process which violate federal law, i.e. the incorporation of the Policy through the "Cooperative Agreement".

On July 10, 1992 the County filed a motion to dismiss and on August 6, 1992 the Authority did the same. On August 31, 1992 the district court heard oral argument on the motions to dismiss and granted the motions to dismiss.[4]

## II. DISCUSSION

The district court stated, in an oral judgment, that it was granting the motion to dismiss because, in its view, no case or controversy was presented. Article III § 2 of the U.S. Constitution limits federal jurisdiction to certain cases or controversies. The principles of standing, ripeness and mootness derive from the Article III limits on the jurisdiction of federal courts. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975) (standing); *Flowers Industries v. F.T.C.,* 849 F.2d 551 (11th Cir.1988) (ripeness); *Church of Scientology Flag Service Org., Inc. v. City of Clearwater,* 777 F.2d 598 (11th Cir.1985) (mootness). The defendants argue that the instant action failed to establish a case or controversy because the plaintiffs do not have standing and the case is not ripe. We find that the present action satisfies the requirements for standing and ripeness, and thus presents a live case or controversy.[5]

### A. Case or Controversy

#### 1. Standing

This lawsuit presents claims against both the Authority and the County for violations of the Fair Housing Act, and claims against the County under 42 U.S.C. §§ 1982 and 1983. In order for this court to have jurisdiction over the claims before us, at least one named plaintiff must have standing for each of the claims. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264, and n. 9, 97 S.Ct. 555, 562 and n. 9, 50 L.Ed.2d 450 (1977); *Thurston v. Dekle,* 531 F.2d 1264, 1269 (5th Cir.1976) ("The threshold case-or-controversy inquiry is whether there existed

---

4. The dismissal was without prejudice and with leave to amend the complaint. The plaintiffs elected to pursue this appeal rather than amend their complaint. Therefore, the order to dismiss without prejudice is considered an adjudication on the merits. *Robinson v. Federal Nat'l Mortg. Ass'n,* 673 F.2d 1247, 1249 (11th Cir.1982). We have jurisdiction over this case as an appeal of a final decision under 28 U.S.C. § 1291.

5. We note, however, the posture of this case as an appeal of a motion to dismiss. We reiterate that we may only affirm the dismissal of the complaint if it is clear that no relief could be

granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. at 73, 104 S.Ct. at 2232 (1984). Thus, our decision is based on reasonable inferences that the plaintiffs must prove at trial in order to obtain relief. The standing inquiry can be revisited at trial if it appears that facts necessary for standing are not supported by the evidence adduced at trial. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 116, n. 31, 99 S.Ct. 1601, 1616 n. 31, 60 L.Ed.2d 66 (1979).

a named plaintiff with standing to raise the issue before the court."), *vacated on other grounds,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978).[6] Since a class has yet to certified in this case and various claims may result in different remedies, we examine each named plaintiff individually to determine whether that plaintiff has standing to make each claim.

### a. Jackson

■ Jackson is an African-American woman who is eligible for public housing and whose name is on the Authority's wait-list for public housing. She states that she intends to live in the new facility. Assuming the truth of her complaint, we determine that she has standing to bring all of the claims that she asserts.

■ Federal courts have divided the standing doctrine into a two-tiered framework comprised of (1) minimum constitutional requirements for cases and controversies and (2) prudential considerations that limit the exercise of jurisdiction in certain actions. *See E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 984 (11th Cir.1990). Congressional legislation, however, may expand standing to the full extent permitted by Article III, thus proscribing the judicial exercise of prudential considerations. *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608. Jackson's Fair Housing Act claim is brought under § 812 of the Act (42 U.S.C. § 3612), and under this provision Congress has made standing as broad as the Constitution permits.[7] *Id.* 441 U.S. at 109, 99 S.Ct. at 1612. Although the complaint does not specify which provision of the Fair Housing Act the defendants violated in causing their injuries, it is clear that plaintiffs base their claim upon a violation of § 804 of the Act (42 U.S.C. § 3604).[8]

There are three minimum constitutional requirements for standing: (1) the plaintiff must allege an actual or imminent injury; (2) the injury must be traceable to the alleged unlawful conduct; and (3) the relief requested must be likely to remedy the plaintiff's injury. *E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d at 984. Thus, Jackson must plead injury in fact, causation and redressability in order to have standing to assert her claims.

We find that Jackson has properly alleged a redressable injury caused by the defendants. The record before us shows that Jackson claims two distinct injuries—exclusion from the unincorporated five-mile area and, as a result of this exclusion, imminent segregation. Plaintiff Jackson's status in this case is strikingly similar to plaintiff Ransom in *Village of Arlington Heights,* to whom the Supreme Court granted standing under the Fair Housing Act and the Equal Protection Clause. 429 U.S. at 264, 97 S.Ct. at 563. *Village of Arlington Heights* a town obstructed a nonprofit real estate developer in its attempt to construct housing in Arlington Heights. Ransom worked in Arlington Heights and sought housing near his employment, and he asserted that the city's discrimination had thwarted his efforts to find housing near his home. He established that he was eligible to move into the proposed project, and that if it were built he would "probably" move there. *Id.* The exclusion of Ransom from the town was his injury. The Court held that the probability that the project would be built and that Ransom would move into it was substantial enough to grant Ransom standing. *Id.*

Jackson has established a substantial probability that a particular project would be

---

6. This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

7. Section 812(a) of the Fair Housing Act allows for civil actions in federal court to enforce the rights granted by sections 803, 804, 805 and 806 of the Act. 42 U.S.C. § 3612.

8. Section 804 of the Fair Housing Act provides in relevant part:

**Discrimination in the sale or rental of housing and other prohibited practices**

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

built, and that she will move into it. She also claims that she wishes to live in a facility that is not located in a racially impacted area. The bidding process for the project was near completion, the sources of funding were established, and a bidder submitted a bid to construct the facility at a specific proposed site in the unincorporated five-mile area. Furthermore, we believe Jackson has shown a substantial probability that, but for the action of the defendants, the project would not be built in a racially impacted area, and also has a substantial probability of being built on the specific site in the unincorporated five-mile area which is not racially impacted. Assuming the veracity of the complaint, therefore, she has been injured by the Policy and its incorporation into the bidding process. Several facts support this finding. First, the plaintiffs cite us to the HUD policy handbook, which requires that public housing facilities not be located in areas of minority concentration unless it is otherwise not feasible. HUD handbook 7417.1 Rev.–1 10/80 paragraph 3–77(b)(1). In this case it would have been feasible for the facility to be placed in an area without minority concentration. Furthermore, the bid that was submitted for construction of the facility on the site located in the unincorporated five-mile area was the only bid submitted in an area not impacted by race. Jackson's claim, therefore, is not based upon "speculation about the possible actions of third parties not before this court." *Village of Arlington Heights,* 429 U.S. at 264, 97 S.Ct. at 563. Thus, a substantial probability exists that the County Policy caused the injury to Jackson and that the remedy she requests—i.e., elimination of the Policy—will redress that injury. Following *Village of Arlington Heights,* we hold that Jackson has standing to challenge the defendants' actions under The Fair Housing Act and the Equal Protection Clause. *Id.; See also Metropolitan Housing Development*

*Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1285 (7th Cir.1977) (on remand from the Supreme Court, holding that where plaintiffs sought rezoning to permit construction of federally financed housing at a specific site "the defendant has an obligation to refrain from zoning policies that effectively foreclose the construction of any low-cost housing within its corporate boundaries).[9]

Because Jackson has asserted that a specific project would have a substantial probability of being constructed in the unincorporated five-mile area, our decision in the instant case is easily distinguishable from the line of cases denying standing in housing project cases where no specific project was at issue. *See Warth v. Seldin,* 422 U.S. at 508, n. 18, 95 S.Ct. at 2210, n. 18 (holding that usually in suits to challenge exclusionary zoning practices "the initial focus should be on a particular project"); *Hope, Inc. v. County of DuPage, Illinois,* 738 F.2d 797, 806 (7th Cir. 1984) (no standing where there was no showing that any project was in any way impeded); *Jaimes v. Toledo Metro. Housing Authority,* 758 F.2d at 1096–97 (relying on *Hope*); *see also Village of Arlington Heights,* 429 U.S. at 264, 97 S.Ct. at 563 (1977) (finding standing where a suit is focused on a particular project); *Huntington Branch, National Ass'n for the Advancement of Colored People v. Town of Huntington,* 689 F.2d 391, 395 (2d Cir.1982). In the cases denying standing, the question of whether housing would be built in areas that had engaged in discrimination hinged on the willingness of unknown third parties to build there. *See Village of Arlington Heights,* 429 U.S. at 264, 97 S.Ct. at 563. By contrast, Jackson grounded her complaint in the bidding process of a particular project. The construction of a new public housing facility is imminent, and a developer has proposed constructing the facility at a specific site in the unincorporated five-mile area.[10]

9. Jackson has also alleged "neighborhood" standing—that the defendants' actions have assured that she will live in a public housing facility burdened with the effects of segregation. If Jackson is forced to live in segregated public housing, her neighborhood will suffer from discrimination, and she will suffer a distinct injury for standing purposes. We need not decide whether Jackson has "neighborhood" standing,

which is a form of third party standing, since she has established that she was a direct object of the defendants' alleged discrimination. Neighborhood standing is discussed at greater length with regard to plaintiff Musgrove, *infra.*

10. Because a particular project has been proposed in the unincorporated five-mile area, thus ensuring Jackson's standing in this case, we need

Plaintiff Jackson has also filed a claim against the County only under 42 U.S.C. §§ 1982–83.[11] Although the full scope of § 1982 has never been made clear, it has long been held to be a viable provision for challenging exclusionary land use restrictions. *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 417–18, 88 S.Ct. 2186, 2191–92, 20 L.Ed.2d 1189 (1968); *citing Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). Furthermore, courts have entertained challenges to exclusionary practices related to the siting of housing projects under §§ 1982–83. *See Jaimes v. Toledo Metropolitan Housing Authority,* 758 F.2d at 1097, 1101 (granting plaintiffs standing to assert segregation injury under §§ 1982–83); *Atkins v. Robinson,* 733 F.2d 318, 321 (4th Cir.1984) (County Board of Supervisor's rejection of project held to violate §§ 1982–83). These courts have not distinguished the standing requirements for suits under § 1982 or § 1983 in any way that would affect plaintiff Jackson's standing.[12] Because Jackson has adequately asserted a direct injury as a result of the County's discrimination, she has standing under § 1982 and § 1983 in this case.

b. Musgrove

Plaintiff Musgrove asserts claims similar to those of plaintiff Jackson. However, based on the record before us it is clear that she derives standing in a manner different from plaintiff Jackson. Although Musgrove lives in public housing now, she has not asserted any intent to relocate into the new project. Rather, she asserts that she will be injured because the site currently ranked

first for the new project is located next door to the public facility where she resides. Since 86% of the persons on the waiting list for the new facility are African–American, she argues that the defendants' actions with regard to the siting process will exacerbate segregation in her neighborhood. We hold that she does have standing to pursue her Fair Housing Act claim, but do not decide the issue of her standing under §§ 1982–83.

The Supreme Court has held that "the loss of important benefits from interracial associations" is an injury in fact sufficient for standing under § 804, (42 U.S.C. § 3604) of the Fair Housing Act. *Trafficante v. Metro. Life Insurance Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *Gladstone,* 441 U.S. at 112, 99 S.Ct. at 1614. Thus, a plaintiff may have "neighborhood" standing to challenge violations of the Fair Housing Act even if the discriminatory acts are not directed at that person. In order to establish neighborhood standing, the plaintiff must show that the racially discriminatory practice at issue affected the neighborhood where the plaintiff resides. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 377, 102 S.Ct. 1114, 1123, 71 L.Ed.2d 214 (1982). The neighborhood in question must be relatively compact. *Id.* In this case the effect on Musgrove's neighborhood is clear. There is a substantial probability that a facility almost entirely African–American in population will be placed right next door to Musgrove's complex, which is itself almost entirely African–American. The segregative effect of this process on a compact area is distinct and palpable.[13] Musgrove has standing under

---

not address Jackson's argument that a policy which chills site proposals in a particular area might be sufficient to render unnecessary a focus on a particular project. *See Hope v. County of DuPage,* 738 F.2d at 808–09 (considering an argument that local government policy chilled development of public housing, but holding that plaintiffs did not have standing because they did not produce adequate evidence that developers were chilled—and thus not speculating on the legal ramification of such a chilling effect.)

11. Section 1982 states in full that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

Section 1983 provides for civil actions to prosecute a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." Here the right allegedly deprived is the right of equal protection under the laws, which is guaranteed by the Fourteenth Amendment of the U.S. Constitution.

12. However, Musgrove's standing under §§ 1982–83 presents separate issues. *See, infra,* n. 14.

13. The County argues that Musgrove has not properly asserted neighborhood standing because she has not specifically indicated the proximity of her neighborhood to the unincorporated five-mile area where the discrimination allegedly

the Fair Housing Act.[14]

### c. Other Arguments on Standing

 The County argues that the plaintiffs have no standing because they are not entitled to select the site for the public housing themselves. *See Jaimes v. Toledo Metro. Housing Auth.*, 758 F.2d at 1093–94. The relief that the plaintiffs request, however,

took place. The County's argument is misplaced, because the link between the County Policy and its effects on Musgrove's neighborhood is clear without need for more specific pleadings. The County relies on *Anderson v. City of Alpharetta* for the proposition that an exact showing of proximity is necessary for neighborhood standing. 770 F.2d 1575, 1579–80 (11th Cir.1985). That case is easily distinguishable on its facts. In *Alpharetta*, after four years of discovery, the plaintiffs "failed to identify a single plaintiff who has been personally and concretely injured by the alleged discriminatory practices." *Id.* at 1583. Instead, the *Alpharetta* plaintiffs were a collection of persons living throughout the Atlanta area who all alleged segregative injuries based on the rejection of one facility. None of those plaintiffs established that the project which had been unwelcome in Alpharetta would be built near them. Unlike the *Alpharetta* plaintiffs, plaintiff Musgrove has alleged that this facility will be built right next door to her, and that it will further the already existing segregation.

Furthermore, the County argues that Musgrove has not shown a sufficient connection between the Policy and the selection of a site in her neighborhood to sustain a suit against the County based on the segregative effects of the bidding process. We disagree. Simply because there may have been other factors than the Policy that contributed to a bid site being chosen in Musgrove's neighborhood does not erase the fact that the County's policy was also a substantial contributing factor. The County is not so readily relieved from its obligations to follow the law of fair housing. The fact is that a site was chosen next door to Musgrove, and the Policy appears to have been a substantial factor in the selection process.

14. We decline to determine at this stage of the litigation whether Musgrove has standing to assert her claims against the County under §§ 1982 and 1983. Although the Supreme Court has made clear that neighborhood standing is viable under the Fair Housing Act, it has declined to address whether it is appropriate to expand this doctrine under §§ 1982 and 1983. *See Gladstone, Realtors*, 441 U.S. at 115, n. 33, 99 S.Ct. at 1616, n. 33 (declining to address issue of neighborhood standing under § 1982 after granting standing under the Fair Housing Act).

The Supreme Court has indicated that neighborhood standing is a form of third party standing. *Havens Realty*, 455 U.S. at 375, 102 S.Ct. at

does not purport to select a certain site, it merely requests a remedy that eliminates the Policy. Courts have observed that "governmental bodies are bound to uphold and obey the provisions of the Fair Housing Act, ... and cannot seek refuge in broad generalizations regarding the absence of a constitutional guarantee of adequate housing." *Smith v. Town of Clarkton*, 682 F.2d 1055, 1067 (4th

1122. Prudential considerations, inapplicable under the Fair Housing Act, may apply here that limit the exercise of third party standing. *See* Robert G. Schwemm, Housing Discrimination Law 308, 313 (1981); James A. Kushner, The Fair Housing Amendments Act of 1988: The Second Generation of Fair Housing, 42 Vand. L.Rev. 1071 (1989). Although the limits of standing under § 1982 are unclear, this circuit has indicated a willingness to confer standing on a plaintiff under § 1982 who would normally fail to satisfy prudential limits on third party standing. *See Watts v. Boyd Properties*, 758 F.2d 1482, 1485–86 (11th Cir.1985) (granting standing to African–American "testers" who pretended to be interested in renting apartments in order to ferret out discriminatory rental practices). Whether prudential limitations affect neighborhood standing under § 1983, via the equal protection clause, in public housing cases is apparently an issue of first impression, although prudential limitations normally apply fully to equal protection litigation. *See South–Suburban Housing Center v. Greater South Suburban Board of Realtors*, 935 F.2d 868, 878–880 (7th Cir.1991) (granting standing to realtors to assert rights of potential minority home buyers under Fair Housing Act, but denying standing for assertion of equal protection claim on behalf of minorities based on prudential limits against third party standing).

We decline to address Musgrove's standing under these statutes for several reasons. First, plaintiff Jackson clearly has first party direct-injury standing under these provisions, because the defendants' actions were directed at those, like Jackson, with respect to whom the Policy was a causal factor in preventing their moving into a specific project. Thus, the jurisdiction to consider the claims is already established. Second, Musgrove may adduce evidence later in the proceedings that she intends to move into the new facility and is eligible to do so, and therefore possesses first party standing; or she may be able to show that she is fit to assert her third party claims despite the existence of prudential considerations. Third, it is unclear at this stage of the litigation whether any relief sought by the plaintiffs would be affected by standing under §§ 1982–83. Thus, it is not at all clear that the issue will be relevant in this case. Finally, the parties have not briefed this issue at any level of the litigation. If the issue becomes relevant at a later stage in these proceedings, the district court will address it in the first instance.

Cir.1982). If the district court finds that the allegations in the complaint are true, then "the district court has broad and flexible powers to fashion a remedy to fully correct past wrongs." *Id.* at 1068.

The County argues that neither Jackson's nor Musgrove's claims are redressable because striking down the Policy will not guarantee that the facility will be constructed in the unincorporated five-mile area or even that it will be built in an integrated area. Additionally, the County contends that Jackson cannot prove that she would live in the project. The plaintiffs need not reach either level of certainty in order to show redressability. The requirement of redressability is not a demand for complete certainty in results, for requiring absolute certainty "would be to close our eyes to the uncertainties which shroud human affairs." *Huntington Branch, NAACP v. Town of Huntington*, 689 F.2d at 394 (granting standing to plaintiffs challenging a refusal to amend zoning ordinances even though HUD funding had not been secured for the proposed project). Jackson has shown a substantial probability that she would live in the new public housing facility and that, but for the acts of the defendants, the new facility would be built at the specific proposed site in a racially integrated location. Musgrove has shown a substantial probability that the facility would not be built next door to her if the courts intervened. That is sufficient for standing.

#### d. Conclusion on Standing.

In sum, we hold that the plaintiffs have standing to bring their claims. The defen-

dants may contest these facts on summary judgment or at trial. Although we find standing on the pleadings, "it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." *Gladstone, Realtors*, 441 U.S. at 116, n. 31, 99 S.Ct. at 1616, n. 31.

#### 2. Ripeness

Appellants allege that the Policy was adopted with a discriminatory purpose, and that it has a disparate impact. Appellants allege that this additional hurdle—the policy's imposition of the necessity to obtain approval of each particular site from a majority of the County Commission or pay for and win a referendum on the issue—is a hurdle not required to earn approval of any other form of housing in the County. They allege that the Policy was enacted with discriminatory intent and/or impact, and thus it violates the Fair Housing Act, § 1982, and § 1983 via the Equal Protection Clause.

The defendants claim that this suit is not ripe until appellants have completed the process of seeking approval from the County Commission pursuant to the Policy, or if necessary completed the referendum process.[15] We disagree. Assuming that appellants successfully prove at trial that this additional hurdle was interposed with discriminatory purpose and/or with disparate impact, then the additional hurdle itself is illegal whether or not it might have been surmounted.[16]

---

15. The defendants also argue that this suit is not ripe until HUD gives final approval for the site selected. This argument is without merit. According to the plaintiffs, all of the sites ranked and submitted for approval by the Authority are in racially impacted areas. Therefore, the process will have a segregative result regardless of HUD's decision. In *Huntington Branch N.A.A.C.P. v. Town of Huntington*, 689 F.2d at 394, the court allowed a group of plaintiffs hopeful of building a low-income housing facility to challenge the town's restrictive zoning practices, even though the plaintiffs had yet to secure HUD funding necessary to complete the project. Thus, HUD decisions need not be final where an injury is imminent.

16. The defendants argue that this suit is not ripe because the Policy is not expressly discriminatory and has never been applied, relying on *Eide v. Sarasota County*, 908 F.2d 716, 723 (11th Cir. 1990). *Eide* highlighted the difference between "facial" and "as applied" due process attacks on local zoning laws. Facial claims argue that the mere adoption of a zoning law is unconstitutional. *Id.* As applied claims attack statutes that are legal as enacted, but have been applied in an arbitrary and capricious manner. *Id.* In order for an as applied claim to be ripe, the plaintiff usually must demonstrate that the regulation has been applied to him. *Id.* at 724–26. The County urges us to treat this cause of action as an as applied claim against the Policy and apply the

B. *Failure to State a Claim*

 The district court also stated that it was dismissing the plaintiffs' case for failure to state a claim. We find that the plaintiffs have adequately stated a claim upon which relief may be granted. First, we review the Fair Housing Act claim. The plaintiffs assert a general violation of the Fair Housing Act. Although plaintiffs do not specify which provision they claim the defendants violated, it is clear from the nature of the complaint that the claim is based on 42 U.S.C. § 3604(a), which prohibits the "refus[al] to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin." The complaint in this case adequately states a cause of action under § 3604(a), since this suit alleges race-based discrimination affecting the "availability" of public housing within the Authority's territory.[17] The Fair Housing Act is concerned with both the furtherance of equal housing opportunity and the elimination of segregated housing. *South–Suburban Housing Center v. Greater South Suburban Board of Realtors*, 935 F.2d at 882. Therefore, in order to state a claim under § 3604(a), the plaintiffs must allege unequal treatment on the basis of race that affects the availability of housing.

The plaintiffs allege that the defendants have intentionally created a racially segregated public housing market by enacting (or incorporating) the Policy, which was intended to exclude public housing from areas that are predominantly white and to ensure that housing will be placed in areas that contain the greatest concentration of African–Americans. These alleged actions affect the availability of public housing in a substantial portion of the Authority's territory and will exacerbate segregation.[18] Taking as true the

facial/as applied distinction to Fair Housing Act claims.

In this case we can assume arguendo, but expressly not decide, that fair housing claims should be analyzed in a manner similar to the zoning cases discussed in *Eide*, because the instant challenge would in any event be a "facial" challenge. Appellants claim that the adoption of the Policy itself violated the Fair Housing Act because the Policy was adopted with discriminatory purpose and/or with disparate impact. Thus, the adoption of the Policy itself is claimed to have been illegal, and any and all applications of the Policy would be illegal. The County's argument that the suit cannot be a facial challenge because the language of the Policy contains no expressly discriminatory language is meritless. *See United States v. Black Jack*, 508 F.2d 1179, 1184 (8th Cir.1975) (looking beyond the motivation of restrictive legislation aimed at public housing because, *inter alia*, "clever men may easily conceal their motivations").

We note that in adjudicating Fair Housing Act claims, however, some courts have found it unnecessary for plaintiffs to exhaust local remedies, including zoning remedies, where an imminent injury exists. *Town of Huntington*, 689 F.2d at 393–94, n. 3; *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1214–16 (8th Cir. 1972). The *Town of Huntington* court held that the plaintiffs, who sought to overturn a zoning ordinance that prevented the construction of low-income housing, need not make a formal application for rezoning before challenging the zoning ordinance. *Id.* The court stated that "the lack of an exhaustion requirement in Section 812 strongly suggests that such a requirement was not intended. Moreover, the purpose of allowing 'immediate judicial review' ... as an alternative to local remedies would be seriously undercut if Section 812 were conditioned upon prior exhaustion of state administrative remedies." *Id.; quoting Gladstone, Realtors*, 441 U.S. at 106, 99 S.Ct. at 1611. As noted above, we need not reach that issue in this case.

17. Courts have construed the phrase "otherwise make unavailable or deny" in subsection (a) to encompass actions by individuals or government units that affected the availability of housing to minorities. *See, e.g., Halet v. Wend Investment Co.*, 672 F.2d 1305 (9th Cir.1982) (discriminatory rental decisions); *United States v. City of Parma*, 661 F.2d 562 (6th Cir.1981) (numerous actions by city evidenced discrimination, including rejection of public and low-income housing and adoption of restrictive land use ordinances); *United States v. Mitchell*, 580 F.2d 789 (5th Cir.1978) (racial steering); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir.1974) (adoption of restrictive zoning law); *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir.1982) (town withdrawal from multi-municipality housing authority); *N.A.A.C.P. v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir.1992) (insurance redlining). Given the broad application of § 3604(a) to practices that affect the housing market for minorities, we do not hesitate to apply the provision to the instant case, even though the facility will eventually be "available" at some location.

18. A number of facts alleged in the complaint refute the defendants' argument that the allegations are too conclusory to state a claim. Specifically, we note the allegation that the Policy was enacted specifically in response to white citizens' protests, in order to prevent this facility from

allegations of intentional discrimination, it is clear that the complaint states an adequate claim under § 3604(a).

The plaintiffs also argue that the Policy's existence and the bidding that incorporated the Policy have a discriminatory impact on African–Americans. We have held that the Fair Housing Act prohibits "not only direct discrimination but practices with racially discouraging effects . . ."; thus, a showing of a significant discriminatory effect suffices to demonstrate a violation of the Fair Housing Act. *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir.1978);[19] *See United States v. Marengo County Commission*, 731 F.2d 1546, 1558, n. 20 (11th Cir.1984). The exclusion of public housing from the unincorporated five-mile area allegedly has a harsher impact on African–Americans than whites because 86% of the persons on the wait-list for public housing are African–American, and the neighborhood where the new public housing project will probably be built (absent court action) is racially impacted. We must accept these allegations as true, along with any conceivable facts that would be consistent with the complaint. *Hishon v. King and Spalding*, 467 U.S. at 73, 104 S.Ct. at

2232. Under that standard, the plaintiffs have alleged enough facts to state a Fair Housing action claiming discriminatory effects on the availability of housing.[20]

 The district court dismissed the entire complaint, which includes claims against the County under 42 U.S.C. §§ 1982 and 1983. The defendants have not briefed whether a proper claim was stated under these statutes, and accordingly we reinstate the claim. Moreover, no substantial difference between these claims and the Fair Housing Act claims is readily apparent to us, except that plaintiffs who make claims under § 1982, and under § 1983 based on equal protection, have been required to allege that some intentional discrimination took place. *See Village of Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. at 563 (§ 1983 equal protection); *Terry Properties v. Standard Oil Co.*, 799 F.2d 1523, 1532 (11th Cir.1986) (§ 1982); *Clifton Terrace Associates, Limited v. United Technologies Corp.*, 929 F.2d 714, 721 (D.C.Cir.1991) (§ 1982).[21] Because the plaintiffs do allege that the County intentionally discriminated against them, the complaint adequately states both claims.

being constructed within the five-mile area. Plaintiffs allege that the Policy is a deviation from local procedural norms for all other forms of housing. Courts have held that deviations from the procedural norm of local government provide evidence of the discriminatory nature of the challenged process. *Smith v. Town of Clarkton*, 682 F.2d at 1066.

**19.** This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

**20.** The Authority argues that it was innocent of any wrongdoing connected with the enactment of Policy, and powerless to reject the Policy, since counties have no obligation to accept public housing. *See Jaimes v. Toledo Metro. Housing Authority*, 758 F.2d at 1086. Thus, the Authority claims that the complaint states no claim against the Authority because it has no duty or means to force local governments to accept public housing. The Authority does have a duty, however, not to violate the Fair Housing Act. Local governments may not reject public housing for racial reasons. *United States v. Parma*, 661 F.2d at 574–75; *Smith v. Town of Clarkton*, 682 F.2d at 1067. By incorporating the Policy into the bidding process, the Authority recognizes the legal

force of the Policy and subjects the bidding process to the same legal scrutiny given to the Policy and those who enacted it.

**21.** Aside from the intent requirement, the § 1982 case law in housing discrimination, including cases pertaining to the availability of public housing, seems to make little distinction between the requirements to state a claim under § 1982 and § 804 of the Fair Housing Act. *See, e.g., NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir.1992); *Hope, Inc. v. County of DuPage, Illinois*, 738 F.2d 797 (7th Cir.1984); *Jaimes v. Toledo Metro. Housing Authority*, 758 F.2d 1086 (6th Cir.1985). Indeed, there is support for the argument that the requirements for a claim and judgment under the two provisions are identical. *See McHaney v. Spears*, 526 F.Supp. 566, 574 (W.D.Tenn.1981). In reinstating this claim, we do not intend to restrict the district court and the parties from further exploring the proper scope of § 1982 and the applicability of the statute to this case.

Likewise, courts have failed to distinguish, aside from intent, the elements of Fair Housing Act claims from § 1983 equal protection claims related to housing discrimination. *See, e.g., Village of Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. at 563.

### III. CONCLUSION

In sum, we hold that the complaint was improperly dismissed. Construing the complaint in the light most favorable for the plaintiffs, we can conceive of facts under which the plaintiffs have standing and state a claim under which relief may be granted. Furthermore, we find that the claims are ripe for adjudication. Thus, it is clear that this action should not have been dismissed on the pleadings.

REVERSED and REMANDED.