**GLENDALE NEIGHBORHOOD ASSOCIATION, an unincorporated association; Randall Gore, Dwight Saffer, and Debra W. Martin, individually, Plaintiffs,**

v.

**GREENSBORO HOUSING AUTHORITY, and Henry J. Cisneros, in his official capacity as Secretary of the United States Department of Housing and Urban Development, Defendants.**

Civ. No. 2:95CV00277.

United States District Court, M.D. North Carolina, Greensboro Division.

June 8, 1995.

U.S. Attorney, Greensboro, NC, for defendants.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

### FACTS

In 1994, Defendant United States Department of Housing and Urban Development ("HUD") approved a concept for the development of a public housing project submitted by Defendant Greensboro Housing Authority ("GHA"). HUD reserved a grant to pay for the project whenever a proper site could be located and approved. GHA located a site on Glendale Drive in Greensboro, North Carolina.

On February 13, 1995, GHA submitted a proposal to HUD requesting funding and approval of a public housing project ("the project") for low-income families with children to be built on a 13.92 acre site on Glendale Drive. The site is located in Census Tract 126.12. The proposal called for 50 public housing units to be built on eight acres in the northern portion of the site, and 18 single-family detached homes to be built on the remaining six acres in the southern part of the site. The southern six acres are to be sold to non-profit corporations which will build the homes and sell them to low-income families.

Individuals, both minority and non-minority, living near the proposed site learned of GHA's proposal and decided to oppose the project. Plaintiff Glendale Neighborhood Associated ("GNA") is a 300–person unincorporated association of such individuals. The three individual plaintiffs live near the proposed site and are members of GNA.

Plaintiffs' investigation led them to believe that the project violated federal regulations. Specifically, Plaintiffs believed that HUD violated regulations governing the placement of public housing projects in areas of minority concentration. Plaintiffs also believed that HUD was required to consider demographic trends in the racial composition of a proposed site and that HUD did not do so in this case.

Gary L. Beaver, Patton Boggs, L.L.P., Greensboro, NC, for plaintiffs.

James R. Turner, Turner Enochs & Lloyd, P.A., Greensboro, NC, Gill P. Beck, Office of

Plaintiffs gathered 1980 and 1990 census data for the area and conducted their own demographic survey of the area surrounding the proposed site. Plaintiffs interpreted their data to show that the site is one of minority concentration and that the demographic trend indicates that the area would continue to increase in minority concentration. This information was delivered to GHA on March 21, 1995, and is part of the Administrative Record. On April 3, 1995, HUD mailed its decision to approve the Glendale site to GHA.

Plaintiffs seek a preliminary injunction against the construction of the project.

## ANALYSIS

### I. Standing

■ Defendants argue that Plaintiffs have no standing to pursue this suit. Plaintiffs in the case at bar have alleged that they will be injured by development of the proposed public housing project "because it will result in the creation of a segregated neighborhood in violation of federal law and policy, including the Fair Housing Act and 24 C.F.R. § 941.202." (Am.Verified Compl. ¶ 43, filed May 4, 1995). The analysis of two federal circuit courts is especially persuasive on this issue.

In *Jackson v. Okaloosa County,* 21 F.3d 1531 (11th Cir.1994), a person living in a public housing project next door to a proposed public housing project who did not assert any intent to relocate to the new project brought suit against HUD and others. *Id.* at 1539. She alleged that the defendants violated the Fair Housing Act ("FHA") and HUD rules in the site selection process. *Id.* She also alleged that the defendants maintained a pattern of segregated residential public housing. *Id.* She argued that placement of the proposed public housing project would "exacerbate segregation in her neighborhood." *Id.* The court observed that "[t]he Supreme Court has held that 'the loss of important benefits from interracial associations' is an injury in fact sufficient for standing under § 804 (42 U.S.C. § 3604) of the [FHA]." *Id.* (quoting *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 210, 93

S.Ct. 364, 367, 34 L.Ed.2d 415 (1972)). The court held that "a plaintiff may have 'neighborhood' standing to challenge violations of the [FHA] even if the discriminatory acts are not directed at that person." *Id.* The court set forth some criteria: "In order to establish neighborhood standing, the plaintiff must show that the racially discriminatory practice at issue affect[s] the neighborhood where the plaintiff resides." *Id.* (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 377, 102 S.Ct. 1114, 1123–24, 71 L.Ed.2d 214 (1982)). Moreover, "[t]he neighborhood in question must be relatively compact." *Id.* (citing *Havens,* 455 U.S. at 377, 102 S.Ct. at 1123–24).

The *Jackson* court, reasoning that the proposed facility's population would be almost entirely minority and would be placed next door to the plaintiff's complex, itself almost entirely minority, found that the segregative effect of this occurrence "on a compact area is distinct and palpable." Based on this analysis, the *Jackson* court held that the plaintiff had standing.

In *Alschuler v. HUD,* 686 F.2d 472 (7th Cir.1982), neighborhood residents brought a suit very similar to the one at bar. *Id.* at 477. The court, in examining the defendant's standing argument, quoted the Supreme Court: "The person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is, as Senator Javits said in supporting the bill, 'the whole community.'" *Trafficante,* 409 U.S. at 211, 93 S.Ct. at 368 (citations omitted), *quoted in Alschuler,* 686 F.2d at 477. The court concluded that "[t]his generous view of the [FHA] makes clear that plaintiffs are within the zone of interests to be protected and therefore have standing under the [Administrative Procedure Act] to challenge HUD's decision as contrary to the mandate of [the FHA]." *Id.* at 477–48 (footnote and citations omitted); *see also La Plaza Defense League v. Kemp,* 742 F.Supp. 792 (S.D.N.Y.1990).

Based on the analysis of *Jackson* and *Alschuler* described above, the court finds that Plaintiffs have standing in the case at bar.

### II. Preliminary Injunction

■ In determining whether a preliminary injunction should issue, the court must con-

sider four factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood the plaintiff will succeed on the merits; and (4) the public interest. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193–196 (4th Cir.1977); *see also L.J. v. Massinga*, 838 F.2d 118, 120 (4th Cir.1988), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985). These factors are known as the *"Blackwelder* factors."

The *Blackwelder* factors are not considered in a vacuum; the court must "weigh each of the factors in light of the 'flexible interplay' among all the factors considered." *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 79 (4th Cir.1989) (quoting *Blackwelder*, 550 F.2d at 196). "Because of this flexible interplay, . . . a strong showing by the plaintiff on one aspect of the test can compensate for a weak showing on another." *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 527 (4th Cir.1989).

The Fourth Circuit has stated, however, that "[t]he irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991). "If, after balancing those two factors, the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* (citations omitted).

Based on these principles, the court will examine each of the four *Blackwelder* factors.

1. Likelihood of irreparable harm to Plaintiffs

Plaintiffs argue that they will be irreparably injured if the court does not issue a preliminary injunction. Citing *Gresham v.* *Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir.1984), *cert. denied sub nom. Windrush Partners, Ltd. v. Metro Fair Housing Servs.*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984), Plaintiffs argue that irreparable injury is presumed in this case. *Gresham* states that "[w]hen a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations." *Id.* at 1423 (citations omitted). The *Gresham* court also noted that "housing discrimination causes irreparable injury by denying whites, as well as blacks, the benefits of living in an integrated community." *Id.* at 1424.

The segregation of a neighborhood—especially segregation accomplished through governmental programs—is a harm that affects the residents of the entire neighborhood. Violation of federal housing laws injures not only the residents of the project at issue, but every person living in the neighborhood. The Supreme Court has explained that " 'the whole community' " is the victim of discriminatory housing practices. *Trafficante*, 409 U.S. at 211, 93 S.Ct. at 367–68 (citations omitted).

Plaintiffs also argue that placement of the proposed project near their homes will decrease the market value of their homes. Plaintiffs have submitted an affidavit of an experienced realtor, Ms. Kay S. Tolbert, who has sold homes in Census Tract 126.12 and other parts of southern Greensboro. She states:

> Based on my experience . . . I have a strong opinion that a public housing project on Glendale Drive will have a negative impact on the homes in the area near the proposed project in terms of price and interest level of non-minority buyers. Thus, I believe that the proposed project will reduce the fair market value of homes located near the project.

(Aff. of Kay S. Tolbert at 2, filed April 28, 1995).

It is true "that, in most circumstances, 'the possibility that adequate compensatory or

other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm.'" *Rum Creek Coal Sales,* 926 F.2d at 361 (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952–53, 39 L.Ed.2d 166 (1974)); *see also Hughes Network Sys. v. Interdigital Communications Corp.,* 17 F.3d 691, 693–96 (4th Cir. 1994). However, in the case at bar, this possibility is not sufficiently sound to weigh against Plaintiffs.

Defendants cite no cases where individuals have successfully sought and obtained monetary damages against the state or federal government for unlawful placement of a public housing project near their homes. Sovereign immunity appears to be a substantial obstacle to such relief. Moreover, Defendants do not cite—and the court is not aware of any—adequate compensatory or other corrective relief available for redressing Plaintiffs' potential loss of the "benefits of living in an integrated community." *See Gresham,* 730 F.2d at 1424.

Based on the above analysis, the court finds that Plaintiffs likely will suffer irreparable harm in the future if a preliminary injunction is not issued. The court does not need to decide whether a presumption of irreparable injury is present here because the court finds that Plaintiffs have shown that this *Blackwelder* factor weighs heavily in their favor.[1]

2. Likelihood of harm to Defendants if the preliminary injunction is issued

▇ Defendant GHA asserts that Defendants would be harmed if a preliminary injunction is issued in this case. GHA states that construction costs will increase if a preliminary injunction is issued. GHA submits an affidavit of a licensed professional architect in support of this contention. The architect states that it is his opinion that "construction costs in the Greensboro area generally and for housing projects are arising at a

rate of 6% per annum." (Aff. of Kenneth Bell at 2, filed April 28, 1995).

Although Defendants did not offer evidence pertaining to increased costs for the Glendale project specifically, Defendants' evidence that construction costs generally are rising at 6% annually is sufficient evidence to show that construction costs will probably go up by *some amount* during the life of a preliminary injunction. However, such a conclusion is speculative, as construction costs could go up by a small amount, a large amount, or could even go down. Thus, the court finds that this factor favors Defendants, but does not carry much weight in the *Blackwelder* calculus.

3. Likelihood of prevailing on the merits

▇ The court has found that the balance of hardships favors Plaintiffs. Therefore, Plaintiffs "need only show 'grave or serious' questions for litigation" in order for this court to issue a preliminary injunction. *Rum Creek Coal Sales,* 926 F.2d at 363 (quoting *Massinga,* 838 F.2d at 120). As explained below, however, Plaintiffs have done more than show grave or serious questions for litigation; the court has found that Plaintiffs have shown that HUD's actions at issue in the case are likely arbitrary and capricious.

a. Standard of review

▇ The Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* (hereinafter "APA"), provides that a reviewing court "shall hold unlawful and set aside agency action" if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review of this type is very limited and deferential. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 140–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973). The Supreme Court has explained that this review "requires a finding that the actual choice

---

**1.** Plaintiffs also assert that they will be exposed to greater risks to their personal safety because the violent crime rate in Greensboro's public housing projects exceeds that of Greensboro as a whole. Defendant HUD argues that Plaintiffs' fear of increased crime is unfounded and based on stereotyping. Because the court has found that Plaintiffs have succeeded on this factor on other grounds, the court will not address this argument.

made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A)). Here, the actual choice made at issue is HUD's decision to approve the location of the proposed project at the Glendale location.

 An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). In reviewing HUD's decision, the court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824 (citations omitted).

 An agency's "decision is entitled to a presumption of regularity." *Id.* at 415, 91 S.Ct. at 823 (citations omitted). However, this "presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Id.*

 "Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. Moreover, "[t]he reviewing court should not attempt itself to make up for such deficiencies; [the court] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). The court "will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). However, "[t]he court is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824.

 A court's review of an agency's decision is based on the administrative record.

*Id.* at 420, 91 S.Ct. at 825–26. Based on the principles set forth above, the court will examine the decision in light of applicable law, the standard of review, and the administrative record.

b. The regulations, guidelines, and administrative record

 HUD, like other federal agencies, must follow its own regulations. *See Cross v. United States*, 512 F.2d 1212, 1218 n. 9 (4th Cir.1975) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954)). Moreover, HUD, like other federal agencies, must follow its own guidelines. *See National Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C.Cir.1980) ("Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures." (citations omitted)); *Jewell Smokeless Coal Corp. v. Looney*, 892 F.2d 366, 368 n. 4 (4th Cir. 1989) (same (quoting *National Conservative Political Action Committee*, 626 F.2d at 959)). Failure to follow such regulations and guidelines is generally an arbitrary and capricious action. *See Union of Concerned Scientists v. Atomic Energy Commission*, 499 F.2d 1069, 1082 (D.C.Cir.1974) ("an agency's failure to follow its own regulations is fatal to the deviant action").

(i) "Area of minority concentration"

Regulations and guidelines govern HUD's approval of low-income housing projects. 24 C.F.R. § 941.202(c)(1) provides that "[t]he site for new construction projects must not be located in . . . [a]n area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration."

The Fair Housing and Equal Opportunity Division ("FHEO") of the HUD field office in Greensboro performed the civil rights portion of the site review for the project. Specifically, FHEO reviewed the project for compliance with 24 C.F.R. § 941.202(c).

The Glendale site is located in Census Tract 126.12 and is across the street from the northern border of Census Tract 167. In carrying out its review, FHEO defined the "area of the site" as the combination of Census Tract 126.12 and Census Tract 167. "[T]he following boundaries were used: Randleman Road on the east side of the neighborhood; Interstate 85 on the west and north sides; the southern boundary of Census Tract 167" on the south side. (Admin.R. at 00003, filed Apr. 28, 1995).

FHEO explained its definition of "area of the site":

> The area of the site means the census tract within a metropolitan area in which HUD-assisted housing is proposed to be located. For assisted housing sites located on census tract boundaries, the site area means the census tract in which the assisted housing is located and the census tract(s) adjacent to the boundary on which the assisted housing development is located.

(Admin.R. at 00003).

FHEO determined that the site "is ... outside an area of minority concentration." (Admin.R. at 00003). FHEO also determined that the project fits within the § 941.202(c)(1)(i) "exception." (Admin.R. at 00002). FHEO also determined that the "area of the site" was "racially mixed," but found that the project "will not 'cause a significant increase in the proportion of minority to non-minority residents in the area.'" (Admin.R. at 00003 (quoting 24 C.F.R. § 941.202(c)(2)) (sic: Administrative Record cites section (c)(1)).

Plaintiffs argue that HUD, through FHEO's decisions, acted arbitrarily and capriciously by not following its own regulations and guidelines in its approval of the Glendale site. Specifically, Plaintiffs assert that HUD violated 24 C.F.R. § 941.202(c) and related guidelines. Plaintiffs assert that HUD arbitrarily and capriciously defined the "area of the site," consequently arbitrarily and capriciously designated the "area of the site" as not minority concentrated, and arbitrarily and capriciously found that the project fits within the § 941.202(c)(1)(i) "exception."

Plaintiffs argue that HUD acted arbitrarily and capriciously in defining the "area of the site" as the two census tracts. They assert that it was arbitrary and capricious to select the southern boundary of tract 167 as the southern boundary for the "area of the site" or for the use of *all* of both tracts as the "area of the site." [2]

Neither "area of the site" nor "area of minority concentration" is defined in the regulations. However, HUD Notice H–81–2 sets forth some guidelines for use in defining "area of the site" and "area of minority concentration." H–81–2 is in the Administrative Record. (Admin.R. at 00105–00112). H–81–2 is HUD's 1981 policy statement on Site and Neighborhood Standards. Although H–81–2 indicates on its face that it has expired, HUD has instructed that it still be used for guidance. FHEO quoted from portions of H–81–2 in its analysis. (Admin.R. at 00002–00003).

H–81–2 provides:

2. In support of their claim, Plaintiffs assert that HUD failed to note that a highway cuts through the western side of Census Tract 126.12 and that the highway has a much heavier traffic flow than Randleman Road. Plaintiffs also observed that HUD did not use Vandalia Road as the northern boundary when Vandalia Road, like Randleman Road, is five-lanes and heavily travelled.

Plaintiffs also assert that, in defining the "area of the site," HUD ignored plans to build an interstate bypass 2000 feet south of the site within a few years after the project is scheduled to be completed. Plaintiffs note that they supplied HUD with this information and that it is contained in the Administrative Record. (Admin.R. at 00026). Moreover, Plaintiffs argue that "[t]here is no indication in the Administrative Record that HUD ever visited the site, ever

looked at the surrounding neighborhoods, ever travelled through Tract 126.12, ever traveled through Tract 167 to determine the character of the 'neighborhood,' ever contacted city and county employee to examine aerial photographs or other data that would indicate the character of Tract 167, ever discussed with ... officials the [interstate by-pass] indicated on [a map supplied by Plaintiffs] ... or did anything other than rely on census tract boundaries to define the area of the site." (Pls.' Supplemental Br. at 18, filed May 11, 1995).

Plaintiffs also note that Census Tract 167 is more than fifteen times larger than Census Tract 126.12, is largely agricultural or undeveloped, and has a low population density (only approximately 1250 more people live in Census Tract 167 than live in Census Tract 126.12).

"Areas of minority concentration" must be defined in relation to local conditions. Any area where the proportion of minority residents substantially exceeds, or, as a result of the construction of new assisted housing, would substantially exceed that of the jurisdiction as a whole should be considered an area of minority concentration.

This criterion is not intended to be applied mechanically or with mathematical precision; reasonable judgment should be exercised. Determinations as to whether or not a site is located in an area of minority concentration need not rely solely on census tract data if those data are clearly out of date and do not accurately reflect the neighborhood racial composition. Moreover, what is "substantial" will vary with the circumstances in the area....

In applying this criterion, the current racial composition of an area should not necessarily be conclusive. Demographic trends in the area ... which can be expected to produce changes in the racial composition of the area in the near future must be considered in determining whether an area is one of minority concentration.

(Admin.R. at 00106–00107).

After defining the "area of the site" as the two census tracts, FHEO set forth its "area of minority concentration" analysis:

In CT 126.12, there are 5,136 persons of which 3,144 (61.2%) are non-minority and 1,992 (38.8%) are minority. In CT 167, there are 6,390 persons of which 5,915 (93.5%) are non-minority and 415 (6.5%) are minority. The total population, therefore, of both census tracts is 11,526; 9,119 (79.1%) are non-minority and 2,407 (20%) minority. The area of the site is predominately a non-minority area, and outside an area of minority concentration.

(Admin.R. at 00003). FHEO also noted that "the minority population in the [Census Tracts] where the area of the site is located will not equal or exceed the minority population in the jurisdiction, i.e., City of Greensboro." (Admin.R. at 00003).

 This is the sum of FHEO's "area of minority concentration" analysis set out in the administrative record. Thus, FHEO's

"area of minority concentration" analysis revealed in the administrative record consists only of defining the "area of the site" as two census tracts, a mathematical determination of the combined census tracts' minority concentration from census data, noting that the combined census tracts' minority percentage does not exceed that of Greensboro, and a conclusion that the site is not in an area of minority concentration.

This analysis does not conform to HUD's own guidelines. The selection of two census tracts, one of which (the one that the site is *not* located in) has a minority-population percentage that is *one-sixth* that of the other, to reflect the relevant area without consideration of the local conditions around the site appears arbitrary and capricious. Although HUD Notice H–81–2 clearly states that local conditions *must* be considered in defining an "area of minority concentration," FHEO's analysis reflects no such consideration.

H–81–2 makes it clear that the criteria for determining if the relevant area is one of minority concentration "is not intended to be applied mechanically or with mathematical precision." (Admin.R. at 00106). However, FHEO's analysis in this regard reveals exactly that: a mechanical, mathematical determination.

Moreover, H–81–2 states that "[d]emographic trends ... *must* be considered." (Admin.R. at 00107 (emphasis added)). FHEO's analysis reveals no such consideration.

HUD argues that FHEO must have considered trends because FHEO classified the area as "racially mixed." HUD points out that census data indicates that the minority population of Greensboro is nearly 37% while the combined tract's minority population is only 20%. Thus, HUD argues, a mere reliance on the census data would not have led FHEO to conclude that the area was racially mixed. This reasoning is not, however, anywhere revealed in the Administrative Record.

Moreover, FHEO could have determined the area to be racially mixed based on a variety of non-trend factors. FHEO could have considered 20% to indicate a racially

mixed area. FHEO could have reasoned that most minorities in Census Tract 167 live near the site. FHEO could have considered Block 5 of Census Tract 126.12 alone. FHEO could have considered Census Tract 126.12 alone.

HUD's argument in this regard, like the court's description of other possibilities, is mere *post hoc* speculation. Neither HUD nor the court is allowed such speculation. *See Reuters Ltd. v. FCC*, 781 F.2d 946, 951 (D.C.Cir.1986) (describing similar arguments as "the forbidden sin of *post hoc* rationalization").

FHEO's explanation of its decision is not simply curt in this case. *See Camp*, 411 U.S. at 143, 93 S.Ct. at 1244. FHEO's explanation is incomplete and reveals a lack of consideration of factors that are required to be examined under HUD's regulations and guidelines. *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867 ("Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem."). Moreover, FHEO's explanation displays an analysis warned against in HUD's guidelines.

The Seventh Circuit has stated: "To find arbitrary and capricious action, a court must be persuaded by concrete evidence, readily available to HUD during its decision-making process, that the area as defined is *clearly not the relevant area* and that as a result, HUD relied on a *materially distorted picture of the racial and economic balance of the relevant area.*" *Alschuler*, 686 F.2d at 485 (emphasis added). In the case at bar, the court is persuaded by concrete evidence contained in the Administrative Record that the area defined by FHEO likely is not the relevant area anticipated by 24 C.F.R. § 941.202(c) and HUD's own guidelines. Moreover, based on the analysis described above, the court finds that FHEO's area definition and the mechanical, mathematical analysis undertaken by FHEO resulted in a materially distorted picture of the racial balance of the site area. A clear picture *at least* includes many of the factors described in HUD's own guidelines. These factors were not present for the photograph in the present case. Thus, under *Alschuler*, FHEO's deter-

mination that the Glendale site is not located in an area of minority concentration appears arbitrary and capricious.

Moreover, at least one court has held that reliance on census tract data *alone* to define a relevant area of minority concentration for public housing site selection is arbitrary and capricious and in violation of HUD's statutory duty to integrate. *See King v. Harris*, 464 F.Supp. 827 (E.D.N.Y.), *aff'd*, 614 F.2d 1288 (2d Cir.1979), *vacated sub nom. Faymor Dev. Co. v. King*, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980). The *King* court reasoned that HUD may not rely on census tracts alone "[w]here ... such boundaries distort the racial composition of a neighborhood and lead to an undue concentration of minorities in a small area." *Id.* at 840.

FHEO's analysis in the case at bar, as revealed in the Administrative Record, reflects a *complete* reliance on census data to determine whether the Glendale site is in an "area of minority concentration." Such action appears arbitrary and capricious. *See King*, 464 F.Supp. at 839 ("imaginary census tract boundaries *alone* reflect neither a community's perception of itself nor the social cohesiveness of a given area"). HUD argues that FHEO did not rely solely upon census data. To support this argument, HUD contends that if FHEO relied solely on census data, then FHEO would not have found that the area was racially mixed. As explained *supra*, HUD's post-hoc speculation as to FHEO's reasoning cannot cure the Administrative Record. *See Reuters*, 781 F.2d at 951 ("the forbidden sin of *post hoc* rationalization").

HUD cites to two federal circuit cases, one of which HUD argues defines a "minority concentrated" area as one having twice the percentage of minorities living in the area's county. *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086, 1090 n. 6. (6th Cir.1985). The other case gave the same definition to "racially impacted." *Jackson*, 21 F.3d at 1534 n. 1. HUD asserts that it is apparent that it did not act arbitrarily and capriciously in defining the area as not minority concentrated when its determination is not in conflict with two federal circuits' definition. HUD also asserts that the

minority concentration in the relevant area does not reach 72% (double Greensboro's percentage minority population) even if Plaintiffs' numbers and "relevant area" definition are used.

■ These arguments ignore the court's role in a case like the present one. The Supreme Court has made it clear: "The reviewing court should not attempt itself to make up for such deficiencies; [the court] may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867 (citing *Chenery*, 332 U.S. at 196, 67 S.Ct. at 1577). Moreover, FHEO's "path" is not reasonably discernable in this case. *See id.* FHEO and, consequently, HUD appear to have failed to "examine the relevant data and articulate a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'" *Id.* Neither HUD nor FHEO may casually ignore HUD's own guidelines. *See DeLoss v. HUD*, 714 F.Supp. 1522, 1534 (S.D.Iowa 1988) ("Consistency in decision-making is one of the basic requirements for non-arbitrary agency action. Thus, an agency must either conform itself to its prior norms and decisions or adequately explain the reasons for its departure." (citations omitted)).

Based on the analysis described above, the court finds that HUD's approval of the Glendale site based on FHEO's finding that the site was not located in an area of minority concentration appears arbitrary and capricious.

(ii) Exception under 24 C.F.R. § 941.202(c)(1)(i)

Although FHEO concluded that the site *is not* in an "area of minority concentration," FHEO found that the site meets the exception provided in 24 C.F.R. § 941.202(c)(1)(i). Section 941.202(c)(1)(i) applies when a site *is* in an "area of minority concentration." Section 941.202(c)(1)(i) states that a new housing project can be built in an area of minority concentration if "sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration."

Plaintiffs argue that FHEO's determination that the Glendale site fits under the exception was arbitrary and capricious and thus caused HUD's decision to approve the Glendale site to be arbitrary and capricious. Plaintiffs argue that FHEO did not conform to § 941.202(c)(1)(i) and HUD's associated guidelines in making its determination as required.

FHEO's analysis in this regard is set out in the Administrative Record:

> In 1977, the Greensboro Housing Authority established and has concentrated on scattered site housing outside areas of minority concentration. The Agency has approximately 2,008 family units of which 487 are outside areas of minority concentration.
>
> Of the 487 units, 179 are two-bedroom and 203 are three-bedroom units located on eight sites outside areas of minority concentration. Minority residents live in all locations. Therefore, we find that this satisfies the criteria defined at 941.202(c)(1)(i).

(Admin.R. at 00001–00002).[3]

Neither "sufficient" nor "comparable" are defined in the regulations. However, HUD Notice HR H–81–2 gives some guidance as to their meaning. H–81–2 provides:

> "Sufficient" should not be interpreted to require that in every locality there be an equal number of assisted units within and outside areas of minority concentration. Rather, application of this standard should produce a reasonable distribution of units each fiscal year which over a period of several years will approach an appropriate balance of housing opportunities within and outside areas of minority concentration. An appropriate balance in any locality *should be determined in light of local conditions* affecting the range of housing

---

**3.** The FHEO attached census data for GHA's communities. (Administrative R. at 00005). This data includes the census tract number, total population, racial makeup by percentage, total housing units, percentages of housing units occupied by black and white persons, total occupied households, and the racial mix of households for each community.

choices available for low-income minority persons and in relation to the racial mix of the locality's population. The basis and procedures for assessing local conditions are set forth in Part VII.

Units may be deemed "comparable" under this standard if they have the same household type (elderly, handicapped, family, large family) and tenant type (owner/renter); require approximately the same tenant contribution towards rent; serve the same income group; are located in the same housing market; and are in standard condition.

(Admin.R. at 00107 (emphasis added)).

Part VII of H–81–2 provides:

The Area Manager must assess local conditions affecting housing choice and the overall impact of HUD assisted housing on the availability of housing opportunities for minority families in and outside areas of minority concentration. This assessment must be made in consultation with the Directors of FHEO, EMAD, Housing and CPD. For each local assessment, the Area Manager shall determine the appropriate level of detail and the extent of the need (if any) for data not now available in the field office to assure that the assessment is adequate to implement the guidance contained in this notice. In making this determination, the Area Manager may set priorities among areas and may take into account staffing constraints which limit the comprehensiveness of the assessment which can feasibly be made. . . .

In making these assessments, the Area Manager should consider the full range of conditions that affect the availability of housing opportunities outside areas of minority concentration. Accordingly, the extent to which the following conditions are present in the locality *must* be taken into account, along with any other factors relevant to housing choice:

[The Notice lists eight factors].

*The assessment, including specific references to the local conditions considered, must be recorded and documented.* This record shall be the basis for approving or disapproving individual projects in areas of minority concentration.

(Admin.R. at 00109–00111 (emphasis added)). FHEO quoted much of H–81–2's language as set out above in its analysis.

■ H–81–2 clearly provides that a determination of the sufficiency of housing opportunities for minority families includes consideration of "local conditions." (Administrative R. at 00107, 00110–00111); *see also King,* 464 F.Supp. at 839–41. No such consideration is evident in the Administrative Record.

H–81–2 also requires certain conditions, when present, to be taken into account in this assessment. These include:

(a) A significant number of assisted housing units has been made available outside areas of minority concentration. . . .

(b) There is significant integration of assisted housing projects constructed or rehabilitated in the past ten years, relative to the racial mix of the eligible population.

(c) There are racially integrated neighborhoods in the locality.

(d) Programs are operated by the locality to assist minority families who wish to find housing outside areas of minority concentration.

(e) Minority families have benefitted from local activities (e.g., acquisition and write-down of sites, tax relief programs for homeowners, acquisitions of units for use of assisted housing units, etc.) undertaken to expand choice for minority families outside areas of minority concentration.

(f) The locality is participating in an approved Areawide Housing Opportunity Plan.

(g) A significant proportion of minority households have been successful in finding units in non-minority areas under Section 8 Existing program.

(h) Comparable housing opportunities have been made available outside areas of minority concentration through programs other than new construction (e.g., public housing acquisition of existing housing with or without rehabilitation, Section 8 Moderate Rehabilitation).

(Admin.R. at 00110–00111).

H–81–2 explicitly provides that "[t]he assessment, including specific references to the

local conditions considered, *must be recorded and documented.*" (Admin.R. at 00111 (emphasis added)). FHEO's analysis states that conditions (a), (b), and (c), "along with other factors relevant to housing choice," must be taken into account. (Admin.R. at 00003). FHEO made specific reference to facts which may demonstrate FHEO's consideration of conditions (a) and (b). However, no specific reference is recorded or documented for the rest of the factors enumerated in H 81–2. There is no indication in the record that the noncited factors were taken into account at all.

Moreover, H–81–2 lists several factors which must be met to deem a unit "comparable" under 24 C.F.R. § 941.202(c)(1)(i). These factors include whether the units at issue require approximately the same tenant contribution towards rent, serve the same income group, and are in standard condition. (Admin.R. at 00107). No discussion of these factors is present in the Administrative Record. Indeed, it does not appear that any evidence pertaining to these factors is mentioned in the Administrative Record.

Significantly, § 941.202(c)(1)(i) specifically requires consideration of income ranges of relevant families. Such consideration is nowhere evidenced in the Administrative Record.

Based on this analysis, the court finds that it appears that FHEO did not comport with 24 C.F.R. § 941.202(c)(1)(i) and HUD's associated guidelines. It appears that FHEO did not make all of the considerations required of it in evaluating the Glendale site for compliance with § 941.202(c)(1)(i). *See State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867; *Shannon v. HUD,* 436 F.2d 809, 819 (3d Cir.1970) ("When an administrative decision is made without consideration of relevant factors it must be set aside."); *cases cited supra* part II.3.b.(i). Therefore, the court finds that HUD's approval of the Glendale site based on FHEO's determination that the site met the requirements of 24 C.F.R.

§ 941.202(c)(1)(i) appears arbitrary and capricious.[4]

Thus, for purposes of this *Blackwelder* factor, the court finds that Plaintiffs will likely succeed on the merits.

### 4. Public Interests

 The public interests at stake in this case are important public concerns. Providing housing as soon as possible to waiting low-income families is certainly in the public interest. All parties recognize that decent, affordable housing is in great demand. GHA has 906 families on its waiting list. This particular interest weighs in favor of allowing Defendants to proceed immediately, without delay, with the project.

However, avoiding racial segregation is also a significant interest and is accompanied by a wide range of societal concerns. The effects of racial segregation on a community are detrimental to present and future residents. The importance of careful avoidance of such segregation weighs heavily in favor of issuing a preliminary injunction in this case.

Moreover, it is in the public's interest to avoid wasting federal money. If this court does not issue a preliminary injunction, Defendants may begin building the project. If the court later rules that Defendants acted arbitrarily and capriciously in choosing the project site, construction of the project will cease and many dollars will likely be wasted. This possibility weighs in favor of granting a preliminary injunction.

Both Plaintiffs and Defendants assert that the public interest factor weighs in their favor. The court finds that both parties have raised public interest concerns of considerable gravity that weigh in their favor. However, the factor favors Plaintiffs by a small, but not insignificant, margin.

Based on the above analysis, the court finds that a preliminary injunction should issue in the case at bar.

---

4. Because the court has found that HUD likely acted arbitrarily and capriciously in approving the site based on 24 C.F.R. § 941.202(c)(1), the court does not reach Plaintiff's assertions as to Defendants' alleged violations of 24 C.F.R. § 941.202(c)(2). Section 941.202(c)(2) provides that "[t]he site for new construction projects must not be located in ... [a] racially mixed area if the project will cause a significant increase in the proportion of minority to non-minority residents in the area."

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER

Upon the complaint, declarations, memoranda and exhibits offered in support of or opposition to Plaintiffs' motion for preliminary injunction, and the oral arguments of counsel at a hearing on said motion held June 1, 1995, and for the reasons stated in the memorandum opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED, pursuant to Rule 65 of the Federal Rules of Civil Procedure that Plaintiffs' motion for preliminary injunction is **GRANTED;**

IT IS FURTHER ORDERED that Defendants, their agents, servants, employees, officers, contractors, and all persons in active concert and participation with them are hereby **ENJOINED,** pending final determination of this action, from releasing federal funds to use for the development of the real property, or any portion thereof, on which the Greeensboro Housing Authority proposes to construct a low-income housing project near the intersection of Glendale Drive and Randleman Road in the City of Greensboro, Guilford County, North Carolina, which property is more particularly described as follows:

BEGINNING at a point located in the northern margin of the right-of-way of Glendale Drive, said point being located approximately 630 feet west of the intersection of the northern margin of the right-of-way of Glendale Drive with the western margin of the right-of-way of the U.S. Highway 220; and running thence South 13° 25′ 31″ West 39.69 feet to a point located within the right-of-way of Glendale Drive; thence located within the right-of-way of Glendale Drive North 84° 55′ 19″ West 426.00 feet to a point; thence North 04° 35′ 59″ East 25.70 feet to a point located in the northern margin of the right-of-way of Glendale Drive; thence with the east line of the property of Ida C. Coltrane (now or formerly) North 04° 35′ 59″ East 1,182.30 feet to an iron pipe, the northeast corner of the property of Ida C. Coltrane, and being a point in the southern line of Shannon Woods Subdivision, Section 4, as per plat thereof recorded in Plat Book 43, Page 59, Guilford County Registry; thence with the southern line of Shannon Woods Subdivision, Section 4, South 82° 25′ 18″ East 610.00 feet to an iron pipe; thence South 13° 17′ 33″ West 598.31 feet to a iron pipe; thence South 13° 49′ 42″ West 196.93 feet to an iron pipe; thence South 13° 25′ 31″ West 359.07 feet to the point and place of BEGINNING, containing 14.236 acres, more or less, according to a survey prepared by Underwood Surveyors, P.A., dated December, 1980;

IT IS FURTHER ORDERED that Defendants, their agents, servants, employees, officers, contractors, and all persons in active concert and participation with them are hereby **ENJOINED,** pending final determination of this action, from taking any steps to develop the real property described above, or any portion thereof, including, but not limited to, entering into contracts to construct or constructing the planned low-income housing project;

IT IS FURTHER ORDERED that the bond previously posted as security for the temporary restraining order shall remain as bond for the issuance of this preliminary injunction.